**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SCOTT WILKINSON, in his individual
capacity and as Executor of the
Estate of Jason Scott Wilkinson;
ALISHA WHITE, an individual;
ESTATE OF JASON SCOTT WILKINSON,
    *Plaintiffs-Appellees,*

    v.

RICK TORRES, individually and as
City of Vancouver Police Officer,
    *Defendant-Appellant.*

No. 09-35098

DC No.
CV 08-5281 BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
January 15, 2010—Seattle, Washington

Filed July 6, 2010

Before: A. Wallace Tashima and Richard C. Tallman,
Circuit Judges, and Consuelo B. Marshall, District Judge*

Opinion by Judge Tashima;
Dissent by Judge Marshall

*The Honorable Consuelo B. Marshall, United States District Judge, Central District of California, sitting by designation.

## COUNSEL

Beau D. Harlan, Vancouver, Washington, for the plaintiffs-appellees.

Stewart A. Estes, Keating, Bucklin & McCormack, Seattle, Washington, for the defendant-appellant.

## OPINION

TASHIMA, Circuit Judge:

On May 8, 2005, Defendant-Appellant Rick Torres ("Torres") shot and killed Jason Scott Wilkinson ("Wilkinson") as Wilkinson was driving a stolen minivan in a residential yard where the officers were on foot. Plaintiffs-Appellees Scott Wilkinson, Alisha Wilkinson, and the estate of Jason Scott Wilkinson (collectively, "Plaintiffs") brought an action against Torres and others, alleging that their constitutional rights under the Fourth and Fourteenth Amendments were violated by Torres' use of deadly force. Torres moved for summary judgment on the issue of qualified immunity, but the district court denied the motion, citing disputed issues of material fact. Torres appeals, arguing that he is entitled to qualified immunity because his use of force was reasonable as a matter of law. We agree and therefore reverse.

## BACKGROUND

On May 8, 2005, at approximately 11:20 a.m., City of Vancouver Police Officer John Key ("Key") was on patrol when he saw a minivan parked near a known drug house. Key checked the license plate on his mobile data center (*i.e.*, an in-car computer) and confirmed over the radio that the vehicle was stolen. Key yelled at the driver to get his attention, but the driver, instead of responding, leaned down out of Key's sight. After half a minute to a minute, the driver sat up, started the car, and started driving away. Key pursued the minivan in his car.

While this was happening, Torres, another Vancouver Police Officer, was on duty nearby. Torres heard Key's request on the radio to check the plate. According to Torres, he "could tell by the tone of [Key's] voice that something was up." Torres joined the pursuit with his siren on and eventually took the lead in order to execute a Pursuit Immobilization Technique ("PIT") maneuver on the minivan.[1] The pursuit proceeded at a moderate speed — five to ten miles over the speed limit. After the minivan entered a "T" intersection, Torres executed the PIT maneuver, causing the minivan to spin. The minivan kept going, however, and Torres executed a second PIT maneuver, causing the minivan to enter a yard on the northwest corner of the intersection.

After entering the yard on the eastern side, the minivan regained control and accelerated in a southwest direction back toward the road. At this point, Clark County Deputy Sheriff Scott Schanaker ("Schanaker"), who had arrived at the scene, positioned his car in the minivan's path to block the escape. The minivan swerved and hit a telephone pole next to Schanaker's car.

---

[1]A PIT maneuver is a law enforcement procedure whereby a police officer bumps the rear quarter panel of the suspect's vehicle with the front quarter panel of the officer's vehicle, sending the suspect vehicle into a spin.

Key and Torres got out of their patrol cars and approached the minivan on foot. Torres yelled at the driver to show his hands. Key attempted to open the driver-side front door and fell on the ground about the same time as the minivan started moving in reverse.[2] The front of the minivan swung toward the driver side, and the rear of the minivan swung toward the passenger side. The wheels on the minivan were spinning and throwing up mud. After one to two seconds, according to Plaintiffs' witness, Key got up and "walked[ ] or jumped out of the way . . . so he wouldn't get ran (sic) over."

Once he saw Key fall down, Torres yelled at the driver to stop. Torres believed that Key had been run over. The minivan continued to back up, and Torres began shooting through the passenger-side window. After a slight pause during which he assessed the situation, Torres continued firing at the driver of the minivan. The minivan continued to arc around Torres, but eventually straightened out and slowed down. Torres called in that shots had been fired. Evidence later showed that Torres had fired eleven rounds of a fifteen-round magazine. According to radio logs, the elapsed time between the final PIT maneuver and the radio call after the shots had been fired was nine seconds.

The driver of the minivan died of multiple gunshot wounds and was later identified as Wilkinson. Plaintiffs brought this 42 U.S.C. § 1983 action against Torres and others. The district court denied Torres' motion for summary judgment based on qualified immunity. Torres timely appeals.

## JURISDICTION AND STANDARD OF REVIEW

Although an appellate court generally does not have jurisdiction over an interlocutory appeal from the denial of a

---

[2]The parties dispute whether Key slipped on the grass or was knocked over by the minivan. This dispute is immaterial to our determination of this case.

motion for summary judgment, an order denying qualified immunity is immediately appealable. *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). Our jurisdiction to review an interlocutory appeal of a denial of qualified immunity, however, is limited exclusively to questions of law. *Sanchez v. Canales*, 574 F.3d 1169, 1173 (9th Cir. 2009). Where disputed issues of material fact exist, we must assume the version of facts presented by the plaintiff. *Id.*

We review a denial of qualified immunity de novo. *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008). In doing so, we must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' " *Scott*, 550 U.S. at 378 (alteration in original) (citations omitted). However, when the facts, as alleged by the non-moving party, are unsupported by the record such that no reasonable jury could believe them, we need not rely on those facts for purposes of ruling on the summary judgment motion. *Id.* at 380.

## DISCUSSION

Plaintiffs claim that Torres violated Wilkinson's Fourth Amendment right to be free from excessive force and Scott Wilkinson and Alisha White's Fourteenth Amendment due process right to familial association. We analyze each claim in turn.

## I.   Fourth Amendment Claim

[1] Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). However, an officer using deadly force is entitled to qualified immunity, unless the law was clearly established that the use of force violated the Fourth Amendment. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The qualified immunity inquiry consists of two parts: (1) "whether the facts that a plaintiff has

alleged . . . or shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009) (citation omitted).

**[2]** Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). On the other hand, it is not constitutionally unreasonable to prevent escape using deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.*

In assessing reasonableness, the court should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Whether the use of deadly force is reasonable is highly fact-specific, *see Scott*, 550 U.S. at 383 ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.' "), but the inquiry is an objective one, *Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions

are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." (citation omitted)). A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

**[3]** Here, Torres did not violate a constitutional right. Even construing the facts in the light most favorable to Plaintiffs, a reasonable officer in Torres' position had probable cause to believe that Wilkinson posed an immediate threat to the safety of Key and himself.[3] When he fired the shots, Torres was standing in a slippery yard with a minivan accelerating around him. The driver of the minivan had failed to yield to police sirens as well as to direct commands to put his hands up and to stop the vehicle. *Cf. Brosseau*, 543 U.S. at 200 (finding that "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight" was not a clearly established Fourth Amendment violation). The minivan was accelerating, its tires were spinning, mud was flying up, and a fellow officer was nearby either lying fallen on the ground or standing but disoriented. The situation had quickly turned from one involving a crashed vehicle to one in which the driver of a moving vehicle, ignoring police commands, attempted to accelerate within close quarters of two officers on foot. In this "tense, uncertain, and rapidly evolving" situation, a reasonable officer had probable cause to believe that the threat to safety justified the use of deadly force.

**[4]** Plaintiffs argue that the declaration of Anthony Davis, a bystander witness, creates triable issues of fact as to whether Key was in harm's way during the shooting, and whether Key and Torres were in each other's line of sight moments before

---

[3]Torres also argues that Wilkinson posed a risk to the public at large. Because the threat to the safety of Key and Torres was enough to justify the use of deadly force, we need not reach this argument.

the shooting. This argument cannot support the denial of summary judgment. Although Davis stated that Key immediately jumped back to his feet after falling, he also stated that he was worried that Key would get run over, because Key was in shock after getting up. More importantly, we must view the facts from Torres' perspective at the time he decided to fire. Even if Key was in fact out of harm's way by the time of the shooting and Key and Torres were in each other's line of sight before the shooting, the critical inquiry is what Torres perceived. Torres' testimony that he saw Key fall, thought Key had been run over, and was afraid that the van would arc back around toward Key, is uncontradicted by any evidence in the record. To the contrary, the evidence shows that the van was still moving in the midst of the officers who were trying to stop it when the fatal shots were fired.

Furthermore, Plaintiffs' sanitized version of the incident cannot control on summary judgment when the record as a whole does not support that version. Plaintiffs state: "Key stood in front of the minivan as it backed slowly away . . . . Torres then walked to the front passenger window . . . and fire (sic) his weapon into the minivan at the driver . . . ." While perhaps true as far as it goes, this version omits the urgency of the situation. After all, the record is uncontroverted that this entire episode occurred in less than nine seconds. *Cf. Scott*, 550 U.S. at 378-79 ("Indeed, reading the lower court's opinion, one gets the impression that respondent, rather than fleeing from police, was attempting to pass his driving test . . . ."). Torres had just run up to the side of the minivan and put his hand on the window when the vehicle started moving again after having crashed into a telephone pole. He could hear the engine revving and the wheels spinning. Although the vehicle was moving at a slow rate of speed because of the slippage, it could have gained traction at any time, resulting in a sudden acceleration in speed. Torres was not observing the minivan from a distance as Davis was, but was standing in the partially enclosed yard with a driver desperate to escape.

Plaintiffs argue that this court should follow the Eighth Circuit's decision in *McCaslin v. Wilkins*, 183 F.3d 775 (8th Cir. 1999), and the Second Circuit's decision in *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003), and find summary judgment inappropriate. These cases, however, are distinguishable.

In *McCaslin*, the decedent's truck had slid over an embankment into a ditch during a high-speed vehicular pursuit. *McCaslin*, 183 F.3d at 777. Although police stated that the truck started driving back up the embankment toward them before they fired any shots, two witnesses stated that the gunshots began almost immediately after the truck left the road, and one of the witnesses stated that the tire tracks did not indicate that the truck had ever started back up the embankment. *Id.* The Eighth Circuit, finding that the disputed facts were material, affirmed the denial of summary judgment for the defendant. *Id.* at 779.

In *Cowan*, the defendant fired twice at the driver of an approaching car from the side of a highway, claiming that he feared he was in danger of being run over. *Cowan*, 352 F.3d at 758-59. The plaintiff presented evidence, however, showing that the car was traveling slowly and that the officer was not in the vehicle's path but off to the side. *Id.* at 759. Furthermore, the officer did not state that the second shot was fired because of any danger to himself, but rather because he was trained to fire twice. *Id.* at 763.

**[5]** Here, unlike in *McCaslin* and *Cowan*, there are no material disputed facts. Torres, the other witnesses, and even Plaintiffs' experts agree that the minivan was backing up in an arc when Torres fired the shots. Because the van could have arced around to run over Key or Torres, or stopped and pulled forward with the same effect, Torres' fear for the safety of himself and others was reasonable.

**[6]** To the extent that *Cowan* requires an officer to reevaluate whether a deadly threat has been eliminated after each shot, we disagree that it should be applied in the circumstances of this case. Such a requirement places additional risk on the officer not required by the Constitution. Torres did not shoot mindlessly, but responded to the situation by ceasing fire after he perceived that the van had lost power and that the threat had been eliminated. *Cf. Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (concluding that the firing of multiple shots "does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat"). Because we conclude as a matter of law that deadly force was authorized to protect a fellow officer from harm, it makes no difference in this case whether Torres fired seven rounds or eleven.[4]

**[7]** The district court based its denial of summary judgment partially on the following testimony by Torres:

> I thought what happened was I fired four rounds, and [Wilkinson] *kept going*, and he was — and then, I fired . . . made a quick assessment, *and he had stopped*, and I fired . . . I fired two more. That's what I think I did.

(Emphasis added.) The single phrase "he had stopped," implying that Wilkinson had stopped before Torres fired the

---

[4]The dissent asserts that two seconds intervened between Torres' first and second volley of shots. Dissent at 9561. We do not decide whether a two-second pause between rapid-fire volleys may be enough time for an officer to reevaluate the need for deadly force. On the record here, no evidence supports a two-second pause between the volleys. Torres testified that the second volley immediately followed the first, and Davis himself did not distinguish one volley from another. Although the radio log shows a two-second interval between a call of "shots fired" and "shots code 3," there is no evidence that these two log entries represent the two volleys of shots. To the contrary, a review of the audio log suggests that at least one "shots code 3" call was made by a speaker other than Key.

second volley, cannot alone support summary judgment where Torres repeatedly testified — in that same sentence, multiple times during the same interview, and in a separate interview — that Wilkinson did *not* stop until after Torres began firing his second volley. *See Scott*, 550 U.S. at 380 ("Where the record *taken as a whole* could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted) (emphasis added)). The quoted sentence from Torres' deposition is ambiguous because a literal reading of the sentence does not make sense — Torres states that Wilkinson "kept going" just before he says Wilkinson "had stopped." Therefore, in this context, the phrase "had stopped" is an insufficient basis for the denial of summary judgment. *Cf. Hart v. Parks*, 450 F.3d 1059, 1068 (9th Cir. 2006) (finding that a single, arguably ambiguous statement did not raise a triable issue of fact).

Plaintiffs next argue that Torres fired at least three rounds into Wilkinson after power was no longer being supplied to the minivan and any safety risk had been eliminated. This interpretation of the evidence also cannot support the denial of summary judgment because, even if it were true, there is no evidence that Torres had immediately perceived the deceleration of the minivan. To the contrary, it suggests that Wilkinson had not stopped before Torres began firing the second volley. Torres testified that he wondered if he had missed Wilkinson, because Wilkinson did not appear to react after the first volley. The entire time that elapsed between the time of the PIT maneuver and the radio call after the last shot was fired was nine seconds. The shots themselves happened so fast that Davis does not appear to have distinguished the two volleys. Torres stopped firing after he perceived that Wilkinson had gone limp and the van had straightened out. As the Fourth Circuit noted in *Elliott*, "the Fourth Amendment does not require omniscience," and absolute certainty of harm need not precede an act of self-protection. *Elliott*, 99 F.3d at 644.

**[8]** A reasonable police officer confronting this scene could reasonably believe that the minivan posed a deadly threat to Key and himself. Thus, Torres' use of deadly force on Wilkinson was constitutional.

Because we conclude that Torres did not violate a constitutional right, we need not reach the question of whether that right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808.

## II.   Fourteenth Amendment Claim

**[9]** This circuit has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children. *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process. *Porter*, 546 F.3d at 1137. In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id.* On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id.* at 1140. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even." *Id.*

**[10]** In *Porter*, this court found that actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly and forced the officers to make "repeated split-second decisions." *Id.* at 1139. The court

noted that "deliberation" should not be interpreted in the narrow, technical sense, reasoning that the Supreme Court had rejected the deliberate indifference standard even in cases where an officer giving chase could have deliberated while pursuing the suspect. *Id.* at 1139-40. Instead, the heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers to act quickly. *Id.* at 1140.

Here, application of the purpose-to-harm standard is clearly appropriate. Within a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot. Ultimately, Wilkinson's act of accelerating in reverse despite repeated warnings to stop forced Torres to make a split-second decision. As opposed to the five minutes which elapsed in *Porter*, the entire sequence of events here from the PIT maneuver to the final shot occurred in less than nine seconds.

**[11]** Applying this standard, no evidence shows that Torres had a purpose to harm Wilkinson apart from legitimate law enforcement objectives. Plaintiffs argue that Torres's intent to harm Wilkinson was apparent because as the minivan slowly backed up from the telephone pole, Torres walked up to Wilkinson and "executed" him. However, no intent to harm separate from a legitimate law enforcement objective is evidenced by the mere fact that Torres shot Wilkinson, especially in the escalating situation with Key having fallen down, the engine revving, and the tires throwing up mud. No one could predict how quickly the minivan would gain traction. Furthermore, because Torres was in a rapidly evolving situation requiring him to make "split-second judgments," we need not scrutinize as closely as the district court did Torres' decision about how best to minimize the risk to his own safety and the safety of others. *See Porter*, 546 F.3d at 1139. In sum, Plaintiffs have not established a substantive due process claim.

## CONCLUSION

**[12]** For the reasons stated above, we reverse the district court's interlocutory order denying Torres' motion for summary judgment and remand to the district court with instructions to grant the motion for summary judgment based on qualified immunity.

**REVERSED and REMANDED.**

---

MARSHALL, District Court Judge, dissenting:

I respectfully dissent on the ground that the majority today decides as a matter of law what I believe is a question of fact properly reserved for the jury. The reasonableness of an officer's use of excessive force pursuant to the Fourth Amendment is a fact-intensive inquiry for the jury, which if raised on summary judgment, must be evaluated in the light most favorable to the victim. *See gen. Jeffers v. Gomez*, 267 F.3d 895, 905-06 (9th Cir. 2001) (collecting cases). Similarly, where the same disputed facts also give rise to both a Fourth Amendment claim and a Fourteenth Amendment "purpose to harm" claim, material and triable issues of fact exist as to both. *See Porter v. Osborne*, 546 F.3d 1131, 1137 (9th Cir. 2008).

## JURISDICTION

I find we lack jurisdiction to review Torres's appeal that he is entitled to qualified immunity because there are material issues of fact in dispute. *See Johnson v. Jones*, 515 U.S. 304, 317-20 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that a "district court's denial of a claim of qualified immunity" is immediately appealable only to "the extent it turns on an issue of law"); *see also Jeffers*, 267 F.3d at 905-06 (concluding that jurisdiction extends only to whether, based on the undisputed facts , the officer is entitled to immu-

nity as a matter of law); *Collins v. Jordan*, 110 F.3d 1363, 1370 (9th Cir. 1997). Torres asks us to: (1) accept his version of the events on the morning of May 8, 2005; and then (2) enter judgment in his favor as a matter of law. *See id.*; *Armendariz v. Penman*, 75 F.3d 1311, 1317 (9th Cir. 1996) (en banc); *Cowan v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) ("Although [the officer] purports to rely on the undisputed evidence . . . his brief . . . is replete with his own version of the . . . to the extent [his version] is disputed by [the victim's,] [his] forms no proper basis for this appeal.") (internal citations omitted).

A reviewing court may not resolve questions of fact in order to reach the legal questions. *See id*. at 762 ("in order to accept [the officer]'s argument that, as a matter of law, his actions were objectively reasonable, one would have to accept, as a matter of *fact*, that [the victim posed an immediate threat].") (emphasis in original). A "defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact." *Johnson*, 515 U.S. at 319-20. Accordingly, we cannot rely on Torres's version of the events. *See Cowan*, 352 F.3d at 762; *see also McCaslin v. Wilkins*, 183 F.3d 775, 779 (8th Cir. 1999) (reasoning that a genuine issue of material fact with regard to the threat the victim posed prevented a finding that the officer's conduct was reasonable as a matter of law).

Based on the foregoing, I would dismiss the appeal for lack of jurisdiction.

## QUALIFIED IMMUNITY ON FOURTH AMENDMENT CLAIM

If I were to accept jurisdiction of this case, I would nonetheless affirm the district court's denial of summary judgment.

The use of *deadly* force is constitutional only in the most limited of circumstances. *See Tennessee v. Garner*, 471 U.S. 1, 9-11 (1985). Because the reasonableness of the use of deadly force is an extremely fact intensive inquiry, "the propriety of a particular use of force is generally an issue for the jury." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1995); *see also Reed v. Hoy*, 909 F.2d 324, 329-30 (9th Cir. 1989) *cert. denied*, 501 U.S. 1250 (1991).

Reasonableness is "judged from the perspective of a reasonable officer on the scene". *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry is objective, rather than subjective. An officer's own motivations and intentions are irrelevant to the Fourth Amendment analysis, *see id.* at 397, because deadly force cases "pose a particularly difficult problem" as "the officer defendant is often the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 2004). Thus, courts should consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story". *Id.*

The case law requires us to consider whether Torres's use of deadly force was reasonable in light of the facts most favorable to the Wilkinsons, *see Jeffers*, 267 F.3d at 905-06, which includes testimony from non-officer eye-witnesses. *See id.* (courts must protect against chance that the officer will "tak[e] advantage of fact that the witness most likely to contradict [the officer's] story — the victim — is unable to testify."); *see also Cowan*, 352 F.3d at 762 ("[W]here the versions of the facts differ, we must consider [the victim]'s version and make all permissible inferences in [his] favor."). Here, the only non-officer eye-witness, and the one most likely to contradict Torres's story, is Anthony Davis. *See McCaslin*, 183 F.3d at 778 (affidavits from non-party eyewitnesses can create material issues of fact).

Statements made by eyewitness Davis who watched the van drive into the sideyard, ER at 307, suggest both that the van

never hit Key, ER at 313-316, 320, and that Wilkinson put the van into reverse to *prevent* hitting Key. ER at 314 ("He was trying to turn around and go the other direction, because he didn't want to run over the cop"), 316 ("He wasn't, like, being erratic . . . He was looking for a direction to go . . . Like, 'Whoa, where do I go?' ").

Davis consistently stated — both to the police in an interview that took place just after the shooting and in his affidavit — that he saw Key:

> [S]lip[ ] on the wet grass, f[a]ll on his back side, was on the ground for only a second or two, then jump[ ] back on his feet, walk[ ] toward the front of the [ ]van . . . [and] st[and] in front of the [ ]van as it backed slowly away from [him].

ER at 307. Davis reiterated on at least three different occasions during his interview with police that: (1) he saw Key walk to the front of the vehicle; and (2) that Key was standing at the front of the vehicle when it started to move slowly backwards. ER at 314, 320, 324.

Then, according to Davis, Torres and Key "made eye contact and appeared to acknowledge each other" and Torres began firing. ER at 308. Davis states that when Torres began firing, the "van was moving in almost the opposite direction from where the officer first stood . . . nowhere near the [ ]van's path of travel and not in harm['s] way." ER at 308. Davis's statement that the "van was traveling at such a slow rate of speed that the officer was able to walk in pace with [it] as he repeatedly fired at the driver", is corroborated by the undisputed forensic evidence that the vehicle moved backwards at about ten miles per hour. *Id*.

Davis's declaration and statement to the police create a material issue of fact as to whether Torres had probable cause to believe Wilkinson posed a threat of serious physical harm

to officer Key. *See McCaslin*, 183 F.3d at 778. "Looking at *only* [Davis]'s version of the events," no reasonable officer who could see his colleague standing in front of the van would have "believed that at th[at] crucial moment use of deadly force was necessary." *Cowan*, 352 F.3d at 763 (emphasis in original). Thus, as in *McCaslin*, the "[h]ow and what transpired after [the vehicle hit the pole] is the essence of this case and there remains a genuine issue [of] material fact as to what happened . . . and how the officers responded". 183 F.3d at 779 (internal citation omitted). Whether Torres and Key acknowledged each other and whether Key stood in front of the van before the shooting are material questions that cannot be resolved on summary judgment.

Reasonableness is determined from the moment the allegedly deadly shot is fired. *Id*. at 763 (considering whether second, deadly round, was reasonable); *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir. 1992). Accordingly, whether Torres's second round was justified is also a question for the jury.

Davis told police that immediately after the first volley of shots, he saw Wilkinson slump into his seat and Wilkinson's hands drop from the steering wheel to his side. *Id*. at 316. Torres shot again.

Here, the evidence suggests that two seconds intervened between Torres's first and second volley of shots. First, Torres stated that he made a "quick assessment [after he fired the first shot], and [Wilkinson] had stopped, and . . . I fired two more". ER at 213. Second, the transcript of the audio "radio traffic" indicates that Officer Key transmitted a call of "Shots Fired" at 11:24:41 a.m. ER at 169. Another call of "Shots. Code 3" was transmitted at 11:24:43 a.m. Based on this transcript and Torres's own statement, a jury could infer that two seconds elapsed before Torres fired again.

Two seconds is sufficient time from which a jury could find that a reasonable officer on the scene could have glanced over

at the vehicle, seen that Wilkinson had been shot and that his hands were no longer on the wheel, and forgone the use of deadly force. Thus, based on the record before it, the district court was correct in holding that there were material issues of fact with respect to whether the second round of deadly shots was reasonable.

Furthermore, although the reasonableness analysis discourages courts from second-guessing officers who must make split-second decisions, *Graham*, 490 U.S. at 396-97, Torres's statement that he quickly assessed the scene after he fired the first shot "and [Wilkinson] had stopped, and I fired [again]", ER at 213, creates a question of fact as to whether Wilkinson had stopped the vehicle before Torres fired the second time.

Thus, I conclude that while "factual conflicts concerning the sequence of events and the true nature of the threat confronting [Officers Key and Torres] might be resolved in [Torres]'s favor at trial, it is neither our job nor the job of the district court to resolve these conflicts". *Andaya*, 958 F.2d at 888. The issue of reasonableness presents material questions of fact which must be resolved by the jury. *Gates*, 27 F.3d at 1443.

## QUALIFIED IMMUNITY ON FOURTEENTH AMENDMENT CLAIM

Next, I agree with the district court that the disputed facts preclude summary judgment in favor of Torres on the Wilkinson's Fourteenth Amendment claim.

Where "actual deliberation" by a police officer prior to using force is impractical, a "purpose of harm" standard applies to due process familial association claims. *Porter*, 546 F.3d at 1131. "View[ed] in the light most favorable [to the parents asserting the claims], [the facts] must demonstrate that [the officer] acted with a purpose to harm [the child] that was unrelated to legitimate law enforcement objectives." *Id*.

Although I agree with the majority that the purpose to harm standard applies, I conclude that the disputed facts, including Anthony Davis's portrayal of the events, prevent us from deciding that Torres did not intend to harm Wilkinson as a matter of law. Whether Torres's conduct "shocks the conscience", *id*. at 1136, is for the jury to decide.