**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAFAEL GONZALEZ, individually and as successor in interest to Adolph Anthony Sanchez Gonzalez, *Plaintiff*, | No. 11-56360 |
| | D.C. No. 2:10-cv-04660-PA-SH |
| and | |
| F.E.V., a minor, individually and as successor in interest to Adolph Anthony Sanchez Gonzalez, by and through her Guardian Ad Litem David Vasquez; ANTOINETTE SANCHEZ, individually and as successor in interest to Adolph Anthony Sanchez Gonzalez, *Plaintiffs-Appellants*, | OPINION |
| v. | |
| CITY OF ANAHEIM; DARON WYATT; MATTHEW ELLIS, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
February 7, 2013—Pasadena, California

Filed May 13, 2013

Before: Diarmuid F. O'Scannlain, Stephen S. Trott,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Clifton

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in a 42 U.S.C. § 1983 action in which plaintiffs alleged that police officers used excessive force in a struggle that led to the death of a person suspected of possessing illegal drugs.

The panel noted that not only was the decedent acting strangely during a traffic stop, but that the officers had reason to believe he was committing and then attempting to conceal a drug offense. He continually ignored the officers' commands and resisted their attempts to physically restrain him. And when he attempted to drive away with an officer in the passenger seat, he made a volatile situation all the more dangerous. The panel held that the use of force was not excessive or disproportionate to the quickly escalating

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

situation and that it was objectively reasonable to resort to deadly force given the speed at which the events occurred.

The panel rejected plaintiffs' claim that the officers' conduct violated their due process right to familial association, holding that nothing in the officers' behavior suggested that there were ulterior motives at work.

Dissenting, Judge Clifton stated that there was a glaring inconsistency regarding what happened during the few seconds before decedent was shot in the head, specifically about whether the vehicle was rapidly accelerating. Judge Clifton stated that a jury might conclude from the contradictory evidence that the police officer's testimony was not believable.

---

## COUNSEL

Melanie T. Partow, Law Offices of Dale K. Galipo, Woodland Hills, California, argued the cause and filed a brief for the Plaintiffs–Appellants. With her on the brief was Dale K. Galipo, Law Offices of Dale K. Galipo, Woodland Hills, California.

Moses W. Johnson IV, Assistant City Attorney, Anaheim, CA, argued the cause and filed a brief for the Defendants–Appellees. With him on the brief was Cristina L. Talley, City Attorney, Anaheim, California.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether police officers used excessive force in a struggle that led to the death of a person suspected of possessing illegal drugs.

## I

### A

On September 25, 2009, at 2:00 AM in the morning, Officers Daron Wyatt and Matthew Ellis, members of the Anaheim Police Department, were responding to a routine call to check on a transient. While turning left at an intersection they were cut off by a van driven by Adolf Anthony Sanchez Gonzalez. Gonzalez made an illegal left turn in front of them and pulled into a gas station. The officers had to brake aggressively to avoid a collision, but they continued on their way to complete the call. Unable to locate the transient, the officers headed back the way they came only a minute or two later, and noticed that Gonzalez's van was still at the gas station.

Their suspicions raised by the near collision, the officers ran the van's plates through the mobile data terminal in their patrol car and discovered that the van had been involved in a prior narcotics stop. According to Wyatt's testimony, the officers decided to follow the van for a short way to see if any law enforcement action was necessary. A few blocks later, they noticed that the van was weaving within its lane and decided to pull it over.

After the officers turned on their lights, the van continued driving for about 200 feet before making a wide-sweeping turn to pull over. The officers pulled in behind the van and approached the vehicle from both sides; Ellis approached on the driver's side and Wyatt on the passenger's side. As Wyatt approached, he saw Gonzalez reach back with his right hand toward the area between the driver and the passenger seats. Wyatt drew his gun and yelled at Gonzalez, warning that if Gonzalez reached back again, he would shoot him.

Gonzalez clenched his hands tightly in his lap. Ellis told him to turn off the vehicle at least twice, but Gonzalez did not respond or comply. Ellis noticed that Gonzalez appeared to be concealing a plastic baggy in his right hand, which he believed could contain drugs. Both officers told Gonzalez to open his hands.

Gonzalez continued to ignore the officers' orders. The officers reached through Gonzalez's open windows to unlock the driver- and passenger-side doors. Wyatt reached through the now-open door and struck Gonzalez on the arm with his flashlight three times.

At this point, Gonzalez moved his right hand toward his mouth, and his left hand toward the area between the seat and the door. Ellis believed Gonzalez was trying to swallow whatever was in his hand. According to Wyatt, Ellis—reaching through the driver-side window—attempted to apply a carotid restraint (or "sleeper hold")[1] on Gonzalez.

---

[1] "A 'sleeper hold' occurs when a person wraps his forearm around the victim's neck with the center of the victim's neck in the crook of the

Ellis claims that he was attempting only to gain control of Gonzalez's arms.

As Ellis struggled with Gonzalez, Wyatt radioed for assistance. Wyatt believed Gonzalez was attempting to strike Ellis, although Ellis himself testified that Gonzalez never attempted to hit him. Wyatt entered the van from the passenger side and, with both of his knees on the seat, began punching Gonzalez in the head and face.

Still struggling with the officers, Gonzalez tried to shift the van into gear by slapping the gearshift with his right hand. Ellis, in an attempt to stop Gonzalez from shifting the van into gear, hit him on the back of the head three times with his flashlight. Gonzalez nonetheless managed to put the car into drive and pulled away with Wyatt still in the passenger seat.

According to Wyatt, Gonzalez "floor[ed] the accelerator." Wyatt moved from his knees to a sitting position and yelled at Gonzalez to stop. Wyatt then attempted to knock the vehicle's gearshift out of gear, but Gonzalez slapped his hand away. Without giving another warning, Wyatt pulled out his gun and shot Gonzalez in the head. According to Wyatt, the van had traveled "approximately fifty feet" in "less than ten" and possibly "less than five" seconds. After the shot, the van hit a parked vehicle and came to a stop. Other officers then arrived and removed Gonzalez from the van, handcuffed him, and performed chest compressions. Gonzalez died shortly thereafter.

---

person's arm. When performed correctly, the hold should cause the victim to temporarily lose consciousness." *United States v. Gray*, 692 F.3d 514, 517 n.1 (6th Cir. 2012).

**B**

On June 23, 2010, Gonzalez's father sued the officers and the City of Anaheim under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment right of familial association and of Gonzalez's Fourth Amendment right to be free from unreasonable and excessive force.  On October 21, 2010, Gonzalez's daughter and successor-in-interest brought a separate suit raising similar federal claims and various state-law claims.  The district court consolidated both actions.

The City of Anaheim and the officers moved for summary judgment.  Gonzalez's representatives waived some of their constitutional claims, and the district court granted summary judgment for the City and the officers on what remained.  The contested constitutional claims alleged that (1) the officers used excessive force in violation of Gonzalez's Fourth Amendment rights and (2) that the officers' actions "shocked the conscience" and so violated the representatives' Fourteenth Amendment rights.  The district court granted summary judgment and held that the force used throughout the encounter was reasonable and that the officers' conduct did not violate the Fourteenth Amendment.  The district court declined to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).  Gonzalez's representatives appeal this grant of summary judgment.

**II**

**A**

Gonzalez's representatives allege that the officers applied excessive force at five instances during the encounter that led to Gonzalez's death: (1) Wyatt's use of his flashlight to hit

Gonzalez on the arm; (2) Ellis's attempt to place Gonzalez in a carotid restraint;[2] (3) Wyatt's punches to Gonzalez's head and face while Ellis was attempting to restrain him; (4) Ellis's strikes to the back of Gonzalez's head with the flashlight; and (5) Wyatt's close-range shot to Gonzalez's head.

Under the Fourth Amendment, police may use only such force as is "objectively reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). To determine whether the use of force was reasonable, we balance the level of force used against the need for that force. *Graham* suggests three factors that courts should consider when evaluating the need for force: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the officers or others, and (3) whether the suspect was actively resisting arrest. *Id.* at 396. These factors, however, are not exclusive and we must consider the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "[I]n the end we must . . . slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).

**1**

Gonzalez's representatives first contend that the flashlight strikes to Gonzalez's arm constituted excessive force. That force was instigated by Gonzalez's refusal to obey several commands to open his hands and turn off the vehicle. Officers may use a reasonable level of force to gain compliance from a resisting suspect who poses a minor threat.

---

[2] Whether a carotid restraint was used is a disputed fact. We must assume that one was attempted to resolve this summary judgment appeal.

*See, e.g.*, *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (holding that officers reasonably used "'stern' but not 'severe'" baton strikes to control a noncompliant suspect); *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106–07 (9th Cir. 2008) (force was not excessive when three officers tackled, pinned, and forcefully subdued an individual who was trespassing and refusing to comply with orders to drop his pen); *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (upholding jury verdict in favor of officers; officers use of "pain compliance techniques" to arrest demonstrators was objectively reasonable). Striking Gonzalez in the arm was not excessive force given his stubborn refusal to follow the officers' commands.

**2**

Gonzalez's representatives next urge that Ellis's attempted carotid restraint, Wyatt's punches to Gonzalez's face, and Ellis's flashlight strikes to Gonzalez's head constituted excessive force. We apply the three *Graham* factors to evaluate the reasonableness of this force.

The first factor looks to the severity of the crime, and here it weighs in the officers' favor. The officers had reason to believe that Gonzalez possessed illegal drugs and was trying to destroy evidence. Generally this factor weighs in favor of the officers if they have "reason to believe" the suspect had committed a "felony-grade offense." *See Coles v. Eagle*, 704 F.3d 624, 628–29 (9th Cir. 2012).

The second *Graham* factor is the immediacy of the threat posed by Gonzalez to the officers or others. This is undoubtedly the most important factor. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Here, both

officers testified that they saw Gonzalez reach down with his left hand between the driver's side door and the seat. At that moment, a reasonable officer in their position could be concerned that Gonzalez was concealing a weapon in that area. Given Gonzalez's repeated refusal to obey the officers' orders and his multiple furtive reaches, the officers had reason to suspect danger. Then, when Gonzalez tried to shift the van into drive with an officer in the vehicle, the situation became substantially more dangerous, and the officers' justification for force increased commensurately. *See, e.g.*, *Scott*, 550 U.S. at 383–84 (officers were justified in ramming a fleeing suspect in a vehicle that posed significant risk to the public; reasonableness inquiry weighs the threat posed by the suspect against the force used by the officers). Because of the possibility of a hidden weapon and the threat the running vehicle posed, the second *Graham* factor weighs in favor the officers.

Finally, the last *Graham* factor asks whether Gonzalez was "actively resisting arrest or attempting to evade arrest by flight." *Coles*, 704 F.3d at 629. Gonzalez engaged in active resistance both in his motions with his hands and by struggling with the officers. *See Mattos*, 661 F.3d at 445 (suspect who refused to get out of her car and stiffened her body and clutched at her steering wheel to frustrate officers engaged in active resistance). Then, when Gonzalez attempted to put the van in drive, his active resistance became attempted flight. Like the other factors, this factor weighs in favor of the officers.

Because all three *Graham* factors support the officers, they were justified in applying significant force. Not only was Gonzalez acting strangely, but the officers had reason to believe he was committing and then attempting to conceal a

drug offense. He continually ignored the officers' commands and resisted their attempts to physically restrain him. And when he attempted to drive away with an officer in the passenger seat, he made a volatile situation all the more dangerous.

**3**

Wyatt argues that, as an unbuckled passenger in a fast-moving vehicle driven by an escaping suspect, he had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Scott*, 550 U.S. at 383 (speeding vehicle poses "actual and imminent threat" to those around him, justifying force posing a "high likelihood of serious injury or death"); *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (attempt to accelerate a van within close quarters of two officers on foot justified the officer's choice to fire eleven shots at the driver). However, Gonzalez's representatives argue that Wyatt's story fails to hold together.

We must keep in mind that deadly force cases are particularly difficult to evaluate at summary judgment because "the officer defendant is . . . the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Here, as in *Scott* and other cases, the only accounts of the events that led to Gonzalez's death come from the testimonies of the two officers who survived the encounter. In such cases, a court should ensure that the officer's story is "internally consistent and consistent with other known facts" to avoid simply accepting a self-serving statement by an officer. *Id.*

Gonzalez's representatives and the dissent argue that Wyatt's testimony that the van traveled approximately fifty feet either contradicts his testimony that the events took "less than ten" and possibly "less than five seconds" or indicates that the van was traveling so slowly that it could not have been a threat.[3]

First, even assuming that the van was traveling relatively slowly, the threat of acceleration—and the threat to Wyatt's life—remained. *Wilkinson*, 610 F.3d at 552 (deadly force was objectively reasonable even though "the vehicle was moving at a slow rate of speed," "it could have gained traction at any time, resulting in a sudden acceleration. . . ."). Thus, the van's speed is not a material fact, even if it were actually disputed. The dissent does not address this point.

Second, the rough estimates of time taken and distance traveled stated in Wyatt's deposition were just that—rough estimates. Wyatt's story is "internally consistent" if we do not ascribe unfounded precision to his estimates. It would be surprising if an officer could recount precise quantitative details about an incident which took mere seconds over a year later. A minor inconsistency in officer testimony does not alone create a dispute of material fact. *See Gregory*, 523 F.3d at 1107–08 ("[E]ven were the officers' accounts of the confrontation incredible, there is no medical or circumstantial evidence that could support the conclusion that the use of force by the officers was excessive."); *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1169-70 (9th Cir. 1996) ("Illuminating a potential minor inconsistency . . . is

---

[3] As Gonzalez's representatives repeatedly observe in their brief, a vehicle that travels 50 feet in 10 seconds would have an average speed of 3.4 miles per hour.

insufficient to raise a genuine issue of material fact regarding the reasonability of the use of force. . .”), *overruled on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997).

Third, one rough estimate divided by another does not provide meaningful evidence on the speed of the van. We cannot weigh the evidence, but we must look at the record as a whole. Wyatt also testified that, after Gonzalez managed to put the van into drive, he “floor[ed] the accelerator and violently accelerated northbound.” This acceleration was fast enough to slam the door shut, trapping Wyatt in the vehicle. Wyatt further testified that when he shot Gonzalez, the van was going about “50 miles per hour.” Ellis confirmed this account of events in his deposition and stated in an interview conducted the day after the incident that Gonzalez “stomped down” on the gas pedal, causing the vehicle to accelerate so rapidly that the tires squealed. The most that a rational trier of fact could conclude from this record is that Wyatt is bad at estimating—hardly a reason to send this case to trial. *Harris*, 550 U.S. at 380 (“Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ‘genuine issue for trial.’”) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The record taken as a whole does not support any inferences other than essentially what the officers claim: Wyatt was an unbuckled passenger in a rapidly accelerating van with an escaping and noncompliant suspect. Gonzalez’s flight could have killed or seriously injured Wyatt. This was not a case where Wyatt had time to deliberate and consider the most measured response; he testified that he tried to knock the vehicle’s gearshift out of gear and that he yelled at

Gonzalez to stop. When these methods failed, further hesitation may have been fatal. Given the speed with which these events occurred, Wyatt was objectively reasonable in resorting to deadly force. *Wilkinson*, 610 F.3d at 553 (holding as objectively reasonable officer's decision to shoot the driver of a van which was accelerating in close quarters with two officers; "absolute certainty of harm need not precede an act of self-protection").

In the alternative, Gonzalez's representatives argue that the shooting was provoked by the officers' prior conduct. As a result, they claim we should hold the shooting unreasonable. However, we have held that in order for an officer's conduct to render an otherwise reasonable response unreasonable, the prior conduct must itself be an independent constitutional violation. *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002). Because the officers' prior conduct never amounted to a constitutional violation, the shooting was not unreasonable as a result.

**B**

Gonzalez's representatives also allege that the officers' conduct violated their due process right to familial association. This substantive due process claim requires that they show that the officers' conduct "shock[ed] the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Because the officers had no time to deliberate, the representatives must show that the officers had a "purpose to harm" Gonzalez for reasons unrelated to legitimate law enforcement objectives. *Id.*; *see also Wilkinson*, 610 F.3d at 554.

The representatives present no evidence to suggest that the officers, at any point, had a purpose "to cause harm unrelated to the legitimate object of arrest" or self-protection. *Porter*, 546 F.3d at 1140. At each stage of the encounter, the officers were forced to make split-second decisions. As explained above, the force that they used was not excessive or disproportionate to the quickly escalating situation. Nothing in the officers' behavior suggests that there were ulterior motives at work.

### III

For the foregoing reasons, Gonzalez's representatives do not show any triable issues of fact that the officers violated Gonzalez's constitutional rights.

**AFFIRMED.**

---

CLIFTON, Circuit Judge, dissenting:

"Deadly force cases pose a particularly difficult problem," we have observed, "because the officer defendant is often the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). This is one of those cases. Rafael Gonzalez is dead and cannot speak for himself.

That does not mean that the court can or should speak for him, but it does mean that we must examine the evidence presented by the defendants with a critical eye. As we held in *Scott*, "the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to

discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id*.

There is a glaring inconsistency in the story told by the police officers here. The main thrust of their testimony might be correct, and it might be the case that their use of deadly force was justified, but we are reviewing a summary judgment and we cannot properly conclude that there is no genuine issue of material fact as to what led to the fatal shooting. As a result, I respectfully dissent.

The inconsistency concerns what happened during the few seconds right before Gonzalez was shot in the head. According to the evidence submitted by defendants, Gonzalez was in the driver's seat of the van. Officer Matthew Ellis approached the van from the driver's side, and Officer Daron Wyatt approached it from the passenger's side. A struggle ensued. Wyatt entered the van from the passenger side and began punching Gonzalez in the head and face. Gonzalez put the car into gear and started driving away, with Wyatt in the van. Wyatt pulled out his gun and shot Gonzalez in the head.

The majority opinion concludes, "[t]he record taken as a whole does not support any inferences other than essentially what the officers claim: Wyatt was an unbuckled passenger in a rapidly accelerating van with an escaping and noncompliant suspect." Majority op. at 13. If that is what happened, then I agree that Officer Wyatt acted reasonably in resorting to deadly force. But it is simply not so clear that the events happened that way. Indeed, the story as told by the officers appears to me to be physically impossible.

There are three pieces to this puzzle: the speed of the vehicle, the distance it traveled, and the time that elapsed. Those pieces don't fit together.

The speed of the van is the most important piece. It was that speed that the majority opinion primarily relies upon to conclude that it was reasonable for Wyatt to shoot Gonzalez in the head. Wyatt testified that Gonzalez "floor[ed] the accelerator and violently accelerated northbound." He estimated that the van was going about 50 miles per hour when he shot Gonzalez. Ellis told a similar story, saying that Gonzalez "stomped down" on the gas pedal, causing the van's tires to squeal.

But that description simply cannot be squared with Wyatt's testimony about time and distance. Wyatt estimated that less than ten seconds, and possibly less than five seconds, passed between the van moving forward and his firing of the fatal shot. He also testified that the van had traveled approximately fifty feet in that time. As plaintiffs have argued, and the majority opinion acknowledges, at 12 n.3, a vehicle that traveled fifty feet in ten seconds would have an average speed of only 3.4 miles per hour. Nobody should mistake 3.4 miles per hour for 50. If the time period is cut to five seconds, the average speed only increases to 6.8 miles per hour. That is hard to mistake for 50 miles per hour, as well. An actual speed of 3 to 6 miles per hour is simply inconsistent with Wyatt's testimony as to the speed of the van.[1] It also appears inconsistent with the testimony of both

---

[1] A vehicle traveling 50 miles per hour covers more than 73 feet in a second. The van was accelerating, so it would take some time for it to reach the final speed, but that is another reason to question the account given by the officers. Powerful sport cars are known for going

Wyatt and Ellis that Gonzalez "floored" or "stomped down" on the gas.

The majority opinion attempts to shrug off this discrepancy by excusing Wyatt's estimates of time and distance as just "rough estimates." Majority op. at 12. That approach is wrong in two different ways.

First, the estimates could not have been that far off. The period of time that elapsed could not have been much shorter, given all that happened during that time according to the officers' testimony. Consider the description of those events provided in the majority opinion: "According to Wyatt, Gonzalez 'floor[ed] the accelerator.' Wyatt moved from his knees to a sitting position and yelled at Gonzalez to stop. Wyatt then attempted to knock the vehicle's gearshift out of gear, but Gonzalez slapped his hand away. Without giving another warning, Wyatt pulled out his gun and shot Gonzalez in the head." *Id.* at 6. Events were moving rapidly, to be sure, but it is not obvious that all of that could have taken place in much less than five seconds. Nor can the estimate that the van traveled about fifty feet be blithely excused. There was plenty of time after the episode took place to check how far the van traveled. Defendants did not submit evidence that the actual distance was substantially greater than fifty feet. We cannot assume that it was.

---

"0 to 60" mph in less than five or six seconds. Gonzalez was driving a 1991 Mazda MPV. The website "Zero to 60 Times" lists a time for a 1992 Mazda MPV to get to 60 mph as 11.2 seconds. *See* http://www.zeroto60times.com/Mazda-0-60-mph-Times.html (last visited April 11, 2013). And it would obviously have to travel a lot farther than fifty feet to get up to speed. The quarter mile time for that vehicle is listed by the same website as 18.1 seconds.

Second, and more importantly, the majority opinion applies the wrong standard when it brushes off the "rough estimates" by emphasizing other parts of the officers' story. This is a summary judgment. It is for the jury to weigh the evidence, not us. A jury could conclude that the inconsistency does not impair the officers' credibility and that even if the estimates of speed, time, and distance were way off, the events were such that Officer Wyatt's life was endangered and his use of deadly force was justified. But a jury could also conclude, presented with this evidence, that the officers' testimony should not be believed. As we held in *Scott*, the court is supposed to "carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." 39 F.3d at 915. In this case, the story told by the officers is not internally consistent. It is not our job to explain away the discrepancy.

It is especially not our job to explain away the discrepancy by making up an unsupported theory. The majority alternatively dismisses the van's speed as immaterial, arguing that even if the vehicle was "traveling relatively slowly," Wyatt's behavior was unquestionably justified. Majority op. at 12. But, as noted above, Wyatt not only estimated the speed of the van as 50 miles per hour, he testified that Gonzalez "floored the accelerator and the van violently accelerated." He did not testify that he acted because he feared that the van might speed up; he claimed that it was already speeding away. The majority opinion's effort to erase the inconsistency isn't consistent with the defendant's own testimony. And it ignores the possibility

that the jury might conclude from the contradictory evidence that Wyatt's testimony was not to be believed.

If Wyatt was sitting in the passenger seat of a vehicle going 3 to 4 miles per hour when he whipped out his gun and, without warning, shot Gonzalez dead, a reasonable jury might conclude that his actions were unreasonable. The majority opinion tries to eliminate speed from its analysis, citing to *Wilkinson v. Torres*, 610 F.3d 546, 552 (9th Cir. 2010). But in *Wilkinson*, we did not say that the threat of speed always justified the use of deadly force; we emphasized the importance of considering all the facts in excessive force cases. *Id*. at 551. In *Wilkinson*, an officer thought his partner was standing in the mud, disoriented, next to a fleeing minivan. *Id*. The minivan was reeling, the driver was attempting to accelerate. *Id*. The officer shot the driver multiple times. *Id*. The plaintiffs argued that the vehicle was moving too slowly to endanger the officers. *Id*. We decided that even so, "it could have gained traction at any time, resulting in a sudden acceleration in speed," while the officer believed his partner to be standing nearby. *Id*. at 552. Given these facts, we decided that deadly force was justified. Here, Wyatt was not on foot next to a vehicle that might run him over at any moment should it have accelerated. He was inside the car – a car that might have been slowly rolling forward. *Wilkinson* does not answer whether Wyatt behaved reasonably. A jury should.

I respectfully dissent.