**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAFAEL GONZALEZ, individually and
as successor in interest to Adolph
Anthony Sanchez Gonzalez,
*Plaintiff*,

and

F.E.V., a minor, individually and as
successor in interest to Adolph
Anthony Sanchez Gonzalez, by and
through her Guardian Ad Litem
David Vasquez; ANTOINETTE
SANCHEZ, individually and as
successor in interest to Adolph
Anthony Sanchez Gonzalez,
*Plaintiffs-Appellants*,

v.

CITY OF ANAHEIM, DARON WYATT,
and MATTHEW ELLIS,
*Defendants-Appellees*.

No. 11-56360

D.C. No.
2:10-cv-04660-
PA-SH

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted En Banc
December 11, 2013—San Francisco, California

Filed March 31, 2014

Before: Alex Kozinski, Chief Judge, and Stephen S. Trott,
Barry G. Silverman, Susan P. Graber, M. Margaret
McKeown, Ronald M. Gould, Marsha S. Berzon, Richard
C. Tallman, Richard R. Clifton, Carlos T. Bea, and Morgan
Christen, Circuit Judges.

Opinion by Judge Clifton;
Partial Concurrence and Partial Dissent by Judge Trott;
Dissent by Chief Judge Kozinski

## SUMMARY[*]

### Civil Rights

The en banc court reversed the district court's summary
judgment and remanded on a Fourth Amendment excessive
deadly force claim, and affirmed the district court's summary
judgment as to a Fourteenth Amendment claim and a non-
deadly force portion of the Fourth Amendment claim, in a
42 U.S.C. § 1983 action brought by successors of Adolph
Gonzalez, who was shot and killed during an encounter with
two Anaheim police officers.

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The court held that based on the record, it could not say that a verdict in favor of the defendants on the claim of excessive deadly force was the only conclusion that a reasonable jury could reach.  The court noted that there was significant inconsistency in the officers' testimony regarding what happened during the few seconds before Gonzalez was shot in the head, specifically whether Gonzalez's vehicle, which contained Officer Wyatt, was rapidly accelerating and posed an immediate threat to safety.

The court held that the constitutional standard for using force less than deadly force was lower and that given the circumstances, defendants were entitled to summary judgment on the uses of force leading up to the gunshot.

The court affirmed the district court's summary judgment for defendants as to plaintiffs' claim that they had been deprived of a familial relationship with Gonzalez in violation of their Fourteenth Amendment right to substantive due process.  The court held that plaintiffs produced no evidence that the officers had any ulterior motives for using force against Gonzalez.

Dissenting in part and concurring in part, Judge Trott, joined by Chief Judge Kozinski and Judges Tallman, and Bea, wrote that given that Officer Wyatt was trapped in Gonzalez's van, his act of self-defense was objectively reasonable, and he would therefore affirm the district court.

Dissenting, Chief Judge Kozinski, joined by Judges Trott, Tallman, and Bea, wrote that how fast the vehicle was moving and how far it had traveled was beside the point given that it was undisputed that at the time he fired the fatal shot, Officer Wyatt was trapped inside a moving vehicle

driven by a man who had resisted the verbal commands, physical restraints, lethal threats and the bodily force of two uniformed officers.

## COUNSEL

Paul L. Hoffman (argued), Schonbrun, DeSimone, Seplow, Harris & Hoffman, Venice, California; Dale K. Galipo and Melanie T. Partow, Woodland Hills, California, for Plaintiffs-Appellants.

Moses W. Johnson (argued) and Cristina L. Talley, Anaheim, California, for Defendants-Appellees.

## OPINION

CLIFTON, Circuit Judge:

Adolph Anthony Sanchez Gonzalez was shot and killed during an encounter with two Anaheim police officers. His successors brought an action seeking damages under 42 U.S.C. § 1983. The district court entered summary judgment in favor of defendants.

Because Gonzalez is dead, the police officers are the only witnesses able to testify as to the events that led to Gonzalez's death. In such a circumstance, we must carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts. After conducting such a review, we conclude that a significant inconsistency in the officers' testimony was sufficient to present a genuine dispute of

material fact.    Based on the current record, summary judgment on the plaintiffs' claim for deadly excessive force was inappropriate.  We reverse and remand that claim for further proceedings.

In addition to the excessive force claim brought on behalf of Gonzalez, the plaintiffs also brought claims in their own right for the denial of a familial  relationship. The district court granted summary judgment for defendants as to those claims as well.  As to that portion of the judgment, we affirm.

## I.  Background

As noted above, the only testimony concerning the events that led to Gonzalez's death came from the two police officers involved in the incident, Anaheim Police Department Officers Daron Wyatt and Matthew Ellis.  They testified that they first noticed Gonzalez when they were responding in their patrol car to an unrelated call at about 2 a.m. on September 25, 2009. A Mazda minivan cut them off as they were making a turn. The minivan turned into a gas station, and the officers continued on their way.

A few minutes later, the officers returned to the area where they had been cut off and noticed that the minivan was still at the gas station. Gonzalez got in the car and began driving southbound. The officers followed him. They observed the minivan weaving within its traffic lane. Although weaving within a lane was not a traffic violation, as Ellis later acknowledged, the officers decided to make a traffic stop and pulled Gonzalez over.

At that time, the officers did not recognize the driver from any prior contacts. They did not have any information that the

minivan had been stolen or had outstanding warrants or citations.   They had no information that the driver had previously committed any crime, had any prior contact with law enforcement, or had any involvement with weapons. At no point during the entire incident did either officer ever see a weapon in the minivan.

The officers exited their vehicle and approached the minivan from both sides. Ellis approached from the driver's side, and Wyatt approached from the passenger side. Wyatt drew his gun.  Wyatt thought he saw Gonzalez reach for something between the driver and passenger seats and warned Gonzalez that if he reached down again, Wyatt would shoot. Gonzalez at that point complied and held his fists in his lap.

The officers told Gonzalez to turn off the vehicle and open his hands, which he held clenched.  Ellis tried to open the driver's side door, but it was locked. The officers reached through the minivan's open windows and opened the driver and passenger side doors. Ellis saw Gonzalez pull his hand out of a bag located between the two front seats. Ellis observed a plastic bag in Gonzalez's right fist.  Ellis told Gonzalez to turn off the vehicle and give him his hands. Gonzalez did not respond to that command.

Wyatt reached into the car, struck Gonzalez's elbow three times with a flashlight, and told Gonzalez to open his hand. Gonzalez then raised his hand up to his mouth, as if to swallow what he was holding. Ellis grabbed Gonzalez. Wyatt testified that he thought Ellis was trying to apply a carotid restraint, but Ellis testified that he was only trying to gain control of Gonzalez's hands. Wyatt also observed that Gonzalez had a clenched fist and was reaching downward with his left hand. Wyatt called for assistance on his police

radio. Wyatt went around to the driver's side to try to help Ellis restrain Gonzalez, but was not able to do so.

Wyatt went back to the passenger side, entered the minivan, and began punching Gonzalez in the head. Ellis observed Gonzalez reaching for the minivan's gear shift with his right hand. Ellis thought Gonzalez was attempting to shift the car into drive so Ellis used his flashlight to hit Gonzalez on the back of the head to try to stop him.

Despite the officers' efforts, Gonzalez managed to shift the minivan into drive, and the minivan began moving. Ellis withdrew from the vehicle as it began moving and struck Gonzalez in the head as he did so. The front passenger door closed behind Wyatt, who remained in the vehicle.

Ellis stated that Gonzalez "stomp[ed]" on the accelerator. Wyatt said that Gonzalez "floored the accelerator" and that the vehicle "violently accelerated."

Wyatt yelled at Gonzalez to stop the car, but he kept going. Gonzalez swatted Wyatt's hand away as he tried to turn off the ignition or shift the transmission to neutral or park. Unable to stop or gain control of the car, Wyatt drew his weapon and shot Gonzalez in the head, killing him. He shot from a distance of less than six inches. The minivan hit a parked car and came to a stop.

Wyatt testified that he fired the shot less than ten seconds after the car started moving, and it could have been less than five seconds. He estimated that the car moved approximately 50 feet in that time and was going 50 miles per hour at the time of the shot.

Gonzalez's father sued the officers and the City of Anaheim under 42 U.S.C. § 1983. He brought claims as his son's successor for excessive force in violation of the Fourth Amendment and on behalf of himself for denial of a familial relationship in violation of the Fourteenth Amendment. Gonzalez's mother and daughter filed a similar action that also raised various state law claims. The district court consolidated the actions.

The defendants moved for summary judgment, and the district court granted the motion. The district court held that the force the officers used during their encounter with Gonzalez was reasonable and that their conduct did not violate the Fourteenth Amendment. Having disposed of the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims. Gonzalez's mother and daughter appeal the district court's grant of summary judgment.

## II. Discussion

We review a district court's grant of summary judgment de novo to determine whether there are any genuine disputes of material fact and whether the moving party is entitled to judgment as a matter of law. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). We view the evidence in the light most favorable to the nonmoving party. *Id.*

### A.  Fourth Amendment Claim

Gonzalez's representatives argue that genuine disputes of material fact preclude summary judgment on their claim that

the officers used unreasonable deadly force against Gonzalez. We agree.

"An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). Factors relevant to assessing whether an officer's use of force was objectively reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The immediacy of the threat posed by the suspect is the most important factor. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). These factors are not exclusive, and we consider the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

In general, we have recognized that an officer must give a warning before using deadly force "whenever practicable." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (citing *Garner*, 471 U.S. at 11–12). Also relevant to reasonableness are the "alternative methods of capturing or subduing a suspect" available to the officers. *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc).

We take the perspective of an officer on the scene without the benefit of 20/20 hindsight and consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

The key issue in this case is whether a reasonable jury would necessarily find that Wyatt perceived an immediate threat of death or serious physical injury at the time he shot Gonzalez in the head.[1] That requires us to consider exactly what was happening when the shot was fired.

As described above, Ellis testified that Gonzalez "stomp[ed]" on the accelerator, and Wyatt said that Gonzalez "floored" it. Wyatt specifically testified that the minivan "violently accelerated." But that is not entirely consistent with Wyatt's other testimony. His story was that the minivan

---

[1] The primary dissenting opinion, by Judge Trott, suggests, at 24, that the question at summary judgment of whether a law enforcement officer's actions were objectively reasonable is a question of law, not a question of fact for the jury, citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But as that footnote in *Scott* makes clear, that does not change the standard to be applied to the question presented by this case. The footnote as a whole states:

> Justice STEVENS incorrectly declares this to be "a question of fact best reserved for a jury," and complains we are "usurp[ing] the jury's factfinding function." At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness of Scott's actions—or, in Justice STEVENS' parlance, "[w]hether [respondent's] actions have risen to a level warranting deadly force" —is a pure question of law.

*Id.* (citations omitted) (emphasis in original). The dispute in this case concerns the relevant set of facts, in particular whether the minivan had violently accelerated and was moving at a high rate of speed. That remains a question of fact for the jury, as to which we must draw all inferences in favor of the nonmoving party at the summary judgment stage.

moved 50 feet in five to ten seconds but was going 50 miles per hour when he shot.

That combination of facts appears to be physically impossible. There are three pieces to this puzzle: the speed of the minivan at the time of the shot, the distance it traveled, and the time that elapsed. These pieces don't fit together. As plaintiffs argued to the district court, a vehicle that traveled 50 feet in ten seconds would have an average speed of only 3.4 miles per hour. If the time period is cut to five seconds, the average speed increases only to 6.8 miles per hour. Even accepting that the minivan would be gaining speed while accelerating, an average speed of 3 to 7 miles per hour appears inconsistent with Wyatt's testimony as to the speed of the vehicle and with the testimony of both Wyatt and Ellis that Gonzalez floored or stomped down on the gas.

"Deadly force cases pose a particularly difficult problem . . . because the officer defendant is often the only surviving eyewitness." *Henrich*, 39 F.3d at 915. This is one of those difficult cases. Gonzalez cannot testify because he is dead, and no other witnesses saw the incident. In such cases, we "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Id.* Accordingly, we carefully examine "all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* We must also examine "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.* We have held that summary judgment should be granted sparingly in excessive force cases. *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011).

This principle applies with particular force where the only witness other than the officers was killed during the encounter.

Based on the record before us, a jury could believe Wyatt's testimony that the minivan traveled about 50 feet before the shot was fired and that less than five or ten seconds passed between the time the vehicle started moving and the time Wyatt fired the shot. *See Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" (internal quotation marks and brackets omitted)).

Although it was argued that the actual distance traveled by the minivan by the time the shot was fired was substantially greater than 50 feet, defendants did not submit evidence to that effect. There was plenty of time after the episode took place to check how far the minivan traveled. It seems likely that there would have been an incident report that would have included descriptions and precise measurements taken afterwards, but defendants did not offer anything like that into evidence. Based on the record, a rational jury was not required to assume that the distance traveled was greater than Wyatt's estimate. Moreover, as it is our obligation to view the evidence in the light most favorable to the nonmoving parties at summary judgment, we cannot simply dismiss the internal contradictions in Wyatt's testimony. *Johnson*, 658 F.3d at 960.

A reasonable jury could accept at face value Wyatt's statements that the car moved approximately 50 feet in about five to ten seconds before he shot Gonzalez. It could thus

find that the minivan was not traveling at a high rate of speed and Wyatt did not reasonably perceive an immediate threat of death or serious bodily injury at the time he shot Gonzalez in the head.

The primary dissenting opinion, by Judge Trott, suggests, at 47, that because the plaintiffs did not dispute that Gonzalez "stomp[ed]" down on the gas pedal, summary judgment must be affirmed. But it was the speed of the minivan, not whether Gonzalez stomped on the gas pedal, that was the key disputed material fact.

The premise of the primary dissent is that the officer acted in response to an immediate threat to his safety or the safety of others. We do not disagree with most of what the primary dissent says.[2] But the existence of an immediate threat to safety in this case is based on the sudden acceleration and speed of the van. Gonzalez's action could not have presented a threat sufficient to justify the use of deadly force unless it caused the car to move in a way that immediately threatened the safety of the officers or the public. The defendants did not argue that such a threat was

---

[2] We disagree with the view in the separate dissent by Chief Judge Kozinski, at 54, that any "sane officer" would have shot Gonzalez in the head, no matter "[h]ow fast the van was moving." The defendants have not tried to make that argument, and we are not compelled by either logic or existing precedent to accept that proposition. As explained below, if the jury found, as it could, that Officer Wyatt was in the passenger seat of a slowly rolling vehicle, it could conclude that he did not face an immediate threat to safety sufficient to justify the immediate use of deadly force. Our decision simply identifies a disputed issue of material fact. If, as Chief Judge Kozinski's dissent bemoans, that gives plaintiffs "a bludgeon with which to extort a hefty settlement," *id*., it will only be because the defendants are concerned that a jury might not view the evidence as the dissent does.

posed if the minivan was actually going only 3 to 7 miles per hour. They argued that "[t]he undisputed evidence is that decedent was speeding down the street going approximately 40 to 50 MPH with Officer Wyatt trapped inside the van." If that were true, we agree that summary judgment in favor of defendants would be appropriate, as the primary dissenting opinion contends. There was a genuine dispute about that fact, however, based on Wyatt's own testimony. This case is about the standard for summary judgment, not whether law enforcement officers face danger and are permitted to use deadly force when faced with an immediate threat to safety.

A jury that found that the minivan was moving slowly could reasonably infer that Gonzalez did not stomp on the accelerator, or that he let off the accelerator even if he stomped down at first, or that a mechanical failure prevented the car from reaching dangerous speeds. Regardless of whether they disputed the use of the word "stomp," the plaintiffs explicitly argued to the district court and to us that the minivan was not going very fast, based on Wyatt's own testimony, and thus that Wyatt did not face an immediate threat of death or serious bodily injury. On this record, the "stomping" does not preclude a triable issue on Wyatt's use of deadly force.

Our decision in *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), a case that also involved an accelerating minivan, does not require the conclusion that the use of deadly force against Gonzalez was reasonable as a matter of law. In *Wilkinson*, we did not hold that the threat of sudden acceleration always justifies the use of deadly force. Instead, we emphasized the importance of considering all the facts in excessive force cases. *Id.* at 551. The officer in *Wilkinson* was standing near a minivan that was trying to accelerate. *Id.* The

minivan's wheels were spinning and throwing up mud because the driver was attempting to accelerate in a slippery area. *Id.* The officer thought his partner may have already been run over by the minivan once and was lying or standing in the mud nearby, possibly disoriented, at risk of being hit again. *Id.* The officer shot the driver. *Id.* The plaintiffs argued that the vehicle was moving too slowly to endanger the officers. *Id.* We decided that, even so, the car "could have gained traction at any time, resulting in a sudden acceleration in speed," while the officer believed his partner to be vulnerable. *Id.* at 552. Given these facts, we concluded that there was no genuine dispute of material fact as to whether the officer's use of deadly force was reasonable.

Here, Wyatt was not on foot next to a vehicle that might run him over at any moment should it have accelerated, and he did not express concern that his partner was vulnerable to being run over. The defendants presented no evidence of anyone else in danger. Instead, Wyatt was inside a car that might have been slowly rolling forward. *Wilkinson* does not answer the question in this case. Based on the current record, a jury could find that Wyatt did not act reasonably.

Similarly, a jury could find that Wyatt reasonably perceived a threat, but not one that justified the immediate use of deadly force. As noted above, the jury may consider the availability of other methods to subdue a suspect. Wyatt had a police baton, pepper spray, and a taser. He could have used any of them, or he could have shot Gonzalez in a nonlethal area of the body to try to stop him from driving further. Instead, he used his gun and intentionally shot Gonzalez in the head. If the jury found that the car was moving slowly at the time, it could also find that other

alternatives could have been used and that the use of deadly force was unreasonable. *See Smith*, 394 F.3d at 703.

A jury could also find that Wyatt failed to give a warning before he shot Gonzalez in the head. The absence of a warning does not necessarily mean that Wyatt's use of deadly force was unreasonable. *See Scott*, 550 U.S. at 383 (explaining that there is no "easy-to-apply-legal test" in excessive force cases). A rational jury may find, however, that if the car was moving at an average speed of 3 to 7 miles per hour, a warning was practicable and the failure to give one might weigh against reasonableness. *See Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001).

We do not hold that a reasonable jury must find in favor of the plaintiffs on this record, only that it could. The jury could also reasonably find, to the contrary, that the minivan was moving dangerously fast and that Wyatt reasonably perceived an immediate threat to his safety sufficient to support the use of deadly force. Other factors identified in *Graham* would support a verdict in favor of the defendants here, as well. By the time Wyatt pulled the trigger, the crimes at issue were relatively severe and Gonzalez was plainly resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396. But based on the record before us, we cannot say that a verdict in favor of the defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach.[3]

---

[3] The constitutional standard for using force less than deadly force is lower. *See Gregory v. County of Maui*, 523 F.3d 1103, 1106–07 (9th Cir. 2008) (holding that "officers had substantial grounds for believing that some degree of force was necessary" where suspect was possibly under the influence of drugs, acting bizarrely, trespassing, and refusing repeated

## B. Fourteenth Amendment Claim

The plaintiffs also assert on their own behalf, as Gonzalez's relatives, that they have been deprived of a familial relationship with Gonzalez in violation of their Fourteenth Amendment right to substantive due process. Such a claim requires the plaintiffs to prove that the officers' use of force "shock[ed] the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Based on the record, a reasonable jury could not so find. Where, as here, the officers did not have time to deliberate, a use of force shocks the conscience only if the officers had a "purpose to harm" the decedent for reasons unrelated to legitimate law enforcement objectives. *Id.* The plaintiffs produced no evidence that the officers had any ulterior motives for using force against Gonzalez, and the district court properly granted summary judgment on this claim. *See Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (explaining that "speculation as to . . . improper motive does not rise to the level of evidence sufficient to survive summary judgment").

## III. Conclusion

For the foregoing reasons, the district court's grant of summary judgment as to the Fourth Amendment excessive deadly force claim is reversed and remanded. The district court's grant of summary judgment as to the Fourteenth

---

commands to drop a pen). Because it is undisputed that Gonzalez did not respond to the officers' directions before any force was applied, appeared to be trying to swallow potential evidence, and began driving away, the defendants were entitled to summary judgment on the uses of force leading up to the gunshot, such as striking Gonzalez with a flashlight or hitting him in the head as he shifted the minivan into gear.

Amendment claim and the non-deadly force portion of the Fourth Amendment claim is affirmed.

Each party shall bear its own costs.

**AFFIRMED IN PART AND REVERSED IN PART; REMANDED.**

---

TROTT, Circuit Judge, with whom KOZINSKI, Chief Judge, and TALLMAN and BEA, Circuit Judges, join dissenting in part and concurring in part:

Instead of cooperating with the police, Gonzalez stomped on his van's accelerator and fled from a traffic stop, igniting a dangerous chase. What makes this chase unusual is that Officer Wyatt was trapped in Gonzalez's van. After yelling at Gonzalez to stop and unsuccessfully trying to disable the vehicle, Officer Wyatt ended Gonzalez's violent attempt to escape by shooting him. As much as one might have wished for a different outcome, I conclude that Officer Wyatt's act in self-defense was objectively reasonable. Thus, I would affirm the district court.

## I

The issue here is different from our usual two-part fare in Fourth Amendment excessive force litigation. Officers Wyatt and Ellis do not request qualified immunity under prong two

of the *Saucier v. Katz*,[1] *Pearson v. Callahan*[2] test on the ground that what they did had not been clearly established to be a violation of the excessive force prohibition of the Fourth Amendment. When questioned during oral argument why his clients were not asking for qualified immunity, counsel pointed out that the summary judgment threshold issue under either approach — which we call "prong one" in judicial short form — is the same, i.e., whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If not, the question of immunity becomes moot. *See Pearson*, 555 U.S. at 236 ("In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that . . . the relevant facts do not make out a constitutional violation at all.").

Focusing on prong one, these officers maintain that the law covering their actions was established twenty five years ago; and pursuant to that established law, what they did shortly after midnight on September 25, 2009, was objectively reasonable and therefore constitutional. The Supreme Court law they relied on as to their encounter with Gonzalez is this: when faced with a suspect who is resisting arrest and attempting to evade apprehension by flight from serious crimes under circumstances that pose an immediate threat to their safety or the safety of others, police officers may use deadly force to protect themselves and the public at large.

---

[1] 533 U.S. 194 (2001).

[2] 555 U.S. 223 (2009).

This case perforce is not just about how officers handle criminal suspects, but also what the judiciary has consistently said is constitutionally permissible when those suspects endanger peace officers' lives or safety. Accordingly, the ramifications of our decision radiate far beyond this particular lawsuit.

## II

Every day of the year, law enforcement officers leave their homes to police, protect, and serve their communities. Unlike most employees in the workforce, peace officers carry firearms because their occupation requires them on occasion to confront people who have no respect either for the officers or for the law. Chief Judge Kozinski put it well in *Mattos v. Agarano* when he said,

> By asking police to serve and protect us, we citizens agree to comply with their instructions and cooperate with their investigations. Unfortunately, not all of us hold up our end of the bargain. As a result, officers face an ever-present risk that routine police work will suddenly become dangerous.

661 F.3d 433, 453 (9th Cir. 2011) (en banc) (Kozinski, C.J., concurring in part and dissenting in part).

This case inexorably requires us to answer two related questions involving officer safety on the job. First, to what extent are those officers entitled to protect themselves during dangerous situations so they may return home as healthy as before? Second, can they, or can they not, rely on the authoritative constitutional guidance the judiciary has

provided for them as to what they may do when confronted by a suspect who poses an immediate threat to their safety and the safety of others?

### III

The men and women who become officers of the law have been selected by their agencies according to demanding criteria of suitability for their profession. Many officers have degrees from colleges and universities in law enforcement. Police departments in California — including the Anaheim Police Department — almost uniformly require that a candidate graduate from a police academy approved by the State Commission know as POST, which stands for Peace Officer Standards and Training.[3] Once employed, officers receive in-service and special training from their departments.

What are they taught in the classroom and in POST academies? What the law is, and how to enforce it. Peace officers' primary sources of information and guidance are not only the Constitution and the statutes passed by the legislative branch, but more importantly in connection with the resolution of this controversy, case law. Because the principles in our Constitution, such as the Fourth Amendment's prohibition against unreasonable seizures, appear in broad abstract terms, justices and judges use published opinions — case law — to provide police departments and individual officers with more specific guidance, such as the general rule that the use of excessive force to make an arrest is an unreasonable seizure, and is therefore actionable in civil court pursuant to 42 U.S.C. § 1983. Just as I am certain that no law student graduates

---

[3] *See* Cal. Penal Code §§ 13500, 13510.

without taking a course in contracts, I am equally certain that all police officers have been instructed as to the acceptable use of deadly force.

The core of their curriculum is the Supreme Court's constitutional guidance in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), which law enforcement regards as orthodox scripture. Those cases provide fair warning of what police cannot do, but also what they can. And, just as officers are required to follow the law, so too are they entitled to be protected by it as they confront the daily challenges of their work responsibilities. Precisely what we have said and what we have held about the vulnerable circumstances Officer Wyatt found himself in are central to understanding the reasonableness of Officer Wyatt's use of deadly force and his exercise of his right of self-defense. Therefore, I choose not to paraphrase or summarize our opinions, but to quote from them at length.

## IV

What have we, the federal judiciary, said about how officers may react to facts and circumstances such as those encountered by Officers Daron Wyatt and Matthew Ellis when they stopped Adolph Anthony Sanchez Gonzalez on September 25, 2009?

In *Tennessee v. Garner* and *Graham v. Connor*, the Supreme Court ruled that an officer may use deadly force in self-defense or in the defense of others if

(1) confronted with a serious crime,

(2) the suspect poses an immediate threat to the safety of the officer or the safety of others, and

(3) the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Garner*, 471 U.S. at 11–12; *Graham*, 490 U.S. at 396. Of these three factors, the most important is number two: the immediacy of the threat posed by the suspect. *Mattos*, 661 F.3d at 441.

The operative word in the second factor is "threat." The word "threat" denotes an *indication* of *impending* danger or harm. The law does not require an officer who immediately faces physical harm to wait before defending himself until the indication of impending harm ripens into the onslaught of actual physical injury. This distinction becomes crucial when, without warning, a criminal suspect begins to use force to resist an officer in the discharge of the officer's sworn responsibilities.

In this connection, the Supreme Court has admonished us in the trial and appellate courts (1) to evaluate the reasonableness of an officer-in-the-field's response "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and (2) to make "allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving," *id.* at 397. The Court added that the test is not whether "in the peace of a judge's chambers" it seems that what officers did in the field was unnecessary. *Id.* at 396. And in *Ryburn v. Huff*, the Court warned that "judges should be cautious

about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." 565 U.S. at _____, 132 S. Ct. 987, 991–92 (2012) (per curiam).

The threshold question at the summary judgment stage of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is "a pure question of law," not a question of fact reserved for a jury. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Included in this "pure question of law" is whether a suspect's actions have risen to a level warranting deadly force. *Id.* In handing down this ruling, the *Scott* Court explicitly rejected Justice Stevens's dissenting view that the objective reasonableness of an officer's actions should always be a question for the jury. *Id.* The status of this threshold issue as "a pure question of law" makes it all the more important that what we say about it can be relied upon by those who must act accordingly in the field. Fair warning is sine qua non of a rule when it applies to officers who must react quickly in tense situations.

## V

## A.

### Did Gonzalez Pose "an Immediate Threat" to the Safety of the Officers and to Others?

Because this case arises from a stop at 2:00 a.m. of a van being driven erratically, I begin with the Supreme Court's longstanding recognition of the perils of the "traffic stop." This common event has attendant personal-safety hazards that peace officers face thousands of times a day throughout our country and about which they receive basic training. In

summary, an officer must presume that a traffic stop, such as the one we evaluate here, is dangerous until he is satisfied of his safety.

The lead case in this area is *Terry v. Ohio*, 392 U.S. 1 (1968), the seminal "stop-and-frisk" decision that presented the Court with "serious questions concerning the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Id.* at 4. In holding that the circumstances of Terry's detention justified an officer's "invasion of Terry's personal security by searching him for weapons," *id.* at 23, the Court embraced the stark realities of the street to explain its holding.

> We are now concerned with more than the governmental interest in investigating crime; in addition, *there is the more immediate interest of the police officer* in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. *Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.* Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.* at 23–24 (emphasis added).

The Court's footnote twenty-one is equally enlightening.

Fifty-seven law enforcement officers were killed in the line of duty in this country in 1966, bringing the total to 335 for the seven-year period beginning with 1960. Also in 1966, there were 23,851 assaults on police officers, 9,113 of which resulted in injuries to the policemen. Fifty-five of the 57 officers killed in 1966 died from gunshot wounds, 41 of them inflicted by handguns easily secreted about the person. The remaining two murders were perpetrated by knives. See Federal Bureau of Investigation, Uniform Crime Reports for the United States – 1966, at 45–48, 152 and Table 51. The easy availability of firearms to potential criminals

in this country is well known and has provoked much debate. See e.g., President's Commission of Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 239–243 (1967). Whatever the merits of gun-control proposals, this fact is relevant to an assessment of the need for some form of self-protective search power.

*Id.* at 24 n.21.

Next, we come to *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam).

We think it *too plain for argument* that the State's proffered justification — the safety of the officer — is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.* "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963)." We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers

than other types of confrontations. Indeed, it appears "that a significant percentage of murders of police officers occurs when the officers are making traffic stops."

*Id.* at 110 (emphasis added) (citations omitted).

Now to 1983, and to *Michigan v. Long*, 463 U.S. 1032 (1983).

In *Adams v. Williams*, 407 U.S. 143 (1972), we held that the police, acting on an informant's tip, may reach into the passenger compartment of an automobile to remove a gun from a driver's waistband even where the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip. Again, our decision rested in part on our view of the danger presented to police officers in "traffic stop" and automobile situations.

Finally, we have also expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed. . . .

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that *roadside encounters between police and suspects are especially hazardous,*

*and that danger may arise from the possible
presence of weapons in the area surrounding
a suspect.*

*Id.* at 1048–49 (emphasis added) (footnote and citations omitted).

The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile. This reasoning is mistaken in several respects. During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will . . . ." Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. Or as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation, such as the one that occurred here, *involves a police investigation "at close range," when*

> *the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ." In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a Terry encounter.*

*Id.* at 1051–52 (emphasis added) (footnote and citations omitted).

In *Maryland v. Wilson*, 519 U.S. 408 (1997), Chief Justice Rehnquist elaborated one of the main reasons the Court has extended constitutional protection to officers conducting traffic stops, a reason with pungent applicability to our case.

> It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, *but from the fact that evidence of a more serious crime might be uncovered during the stop*. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id.* at 414 (emphasis added).

As authority for this holding as to not just the driver but also a passenger, the Court relied on its opinion in *Michigan v. Summers*, 452 U.S. 692 (1981), which highlighted the danger to police searching for narcotics.

> Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the *kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.* The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Wilson*, 519 U.S. at 414 (quoting *Summers*, 452 U.S. at 702–03) (emphasis added).

To support its observations, the Court updated the grim statistics about traffic stops taken from the FBI's Uniform Crime Reports (1994). "[I]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops." *Wilson*, 519 U.S. at 416. In 2011, Chief Judge Kozinski observed that "[i]n the last decade, more than half a million police were assaulted in the line of duty. More than 160,000 were injured, and 536 were killed — the vast majority while performing routine law enforcement tasks like conducting traffic stops and responding to domestic disturbance calls." *Mattos*, 661 F.3d at 453 (Kozinski, C.J., concurring in part and dissenting in part).

Writing in 2009 for a unanimous Court, Justice Ginsburg reaffirmed the Court's unyielding view that traffic stops are "especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Long*, 463 U.S. at 1047). Yet again, she recognized that: "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized, . . . if the officers routinely exercise unquestioned command of the situation.'" *Id.* (brackets in

original) (quoting *Wilson*, 519 U.S. at 414). In *Brendlin v. California*, Justice Souter called the principle of unquestioned police command, a reflection of "a societal expectation." 551 U.S. 249, 258 (2007). We recognized the need for unquestioned obedience to lawful commands during a car stop in *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1325–28 (9th Cir. 1995).

Relying on *Mimms*, the Sixth Circuit has acknowledged another safety concern arising from of a traffic stop where, as here, the officers have reason to believe that the driver is under the influence of a mind-altering substance.

> While safety considerations are always relevant, they have even greater salience here, as Ford had grounds to suspect that Everett was intoxicated. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007) (noting that "[d]runk persons are generally unpredictable," such that extra police precautions may be justified in confronting an intoxicated suspect).

*United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010).[4] We made similar observations in *Gregory v. County of Maui*, where we held that the possibility that a suspect was under the influence of drugs justified the use of "some degree of force" to confront him. 523 F.3d 1103, 1106 (9th Cir. 2008).

---

[4] "Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions." *Pearson*, 555 U.S. at 244–45.

Gonzalez's representatives accept as "undisputed" the officers' reason for stopping the decedent: erratic and unsafe driving. Gonzalez had earlier made an illegal left turn in front of them, almost causing a collision with their police car. Later, the officers saw him driving on the wrong side of the street and then weaving within the van's lane as they attempted to make the stop. Added to these observations at 2:00 a.m. was their knowledge learned from the mobile data terminal in their patrol car that Gonzalez's van had been involved in a prior narcotics stop.

The California Supreme Court understood the ramifications of erratic driving, such as Gonzalez exhibited, when it published its opinion in *People v. Wells*, 136 P.3d 810 (Cal. 2006). That court held that it was reasonable to stop a motorist on no more than an anonymous uncorroborated phoned-in tip that she was "weaving all over the roadway" — even though the officers who stopped her had not seen anything to validate the caller's information. *Id.* at 811–12. The court believed the stop was "reasonable" because of the grave danger to public safety posed by drunken drivers. *Id.* at 813. The court likened an impaired driver to a "'bomb,' and a mobile one at that." *Id.* at 815 (citation omitted). The court continued: "Police officers undoubtedly would be severely criticized for failing to stop and investigate a reported drunk driver if an accident subsequently occurred . . . . [T]he public rightfully expects a police officer to inquire into such circumstances." *Id.* (internal quotation marks and citations omitted). The same can be said for Officers Ellis and Wyatt when they decided to pull Gonzalez over at a time of night notorious for a ubiquity of drunk drivers.

**B.**

**The Undisputed Facts Leading
Up to the Use of Deadly Force.**

We come to the undisputed material facts. These facts come almost verbatim from "Plaintiff's Separate Statement of Disputed and Additional Undisputed Material Facts in Opposition of Defendant's Motion for Summary Judgment" filed in the district court on June 20, 2011. Gonzalez's acceptance of these facts as "undisputed" ensures that they represent a view of the case understood in the light most favorable to his interests. Because they are not contested, these facts are more than just "evidence": they are the givens from which we begin our analysis.

The majority correctly points out that when the only remaining witnesses are the officers, we must look with great care at their testimony, but I have obviated this concern by using only those facts that the plaintiffs have accepted as "undisputed." These facts establish beyond any doubt that when Officer Wyatt shot Gonzalez, (1) he and his partner were confronted with multiple serious crimes, and (2) Gonzalez was actively fleeing to evade arrest.

I present the material facts in two segments. First, those immediately leading up to Officer Wyatt's use of deadly force; and second, those that in a matter of seconds placed Officer Wyatt in immediate peril and caused the shooting.

**1.**

As the officers followed Gonzalez's van, Ellis observed it weaving within its traffic lane. At 2:11 a.m., Wyatt advised

headquarters over his police radio of their intended traffic stop for the van's previous left-turn violation, and he activated their patrol car's emergency lights. The van continued westbound and subsequently made a wide northbound turn on Bond Street, driving left of center of the roadway, northbound in the southbound lane. Gonzalez came to a stop along the east curb of Bond Street. As Wyatt approached Gonzalez in the van, and in response to a sudden movement by the driver on his approach, Wyatt immediately drew his service weapon, pointed it at Gonzalez, and gave him a warning: "If you reach down there again, I'm gonna shoot you." Ellis heard Wyatt's warning. Ellis observed Gonzalez's right hand clenched into a fist and it appeared he was holding something.[5] Ellis told Gonzalez to turn off the van and show his hands. Gonzalez did not comply. The van's engine remained running. Ellis tried to open the driver's door. However, it was locked. The driver's window was open approximately six to eight inches. Ellis reached through the opening with his right hand and tried unsuccessfully to unlock the door by pulling up the lock. On the other side of the car, Wyatt holstered his weapon and unlocked the passenger door by reaching through the partially opened passenger door window. Both officers then used physical force in an attempt to control an uncooperative Gonzalez. During this process, Gonzalez reached downward with his left hand between the driver's seat and the door, as he simultaneously raised his right hand up toward his mouth. Ellis observed a plastic bag protruding from Gonzalez's right fist. Suspecting the bad might contain narcotics, Wyatt commanded Gonzalez to open his hands. Wyatt also observed that Gonzalez had a clenched right fist and was reaching downward with his left hand. Wyatt, who had

---

[5] Detectives later recovered a knife at the scene.

reached into the vehicle from the passenger side, radioed for
backup assistance. Wyatt ran around the rear of the van to
the driver's side to assist Ellis who was grappling with
Gonzalez through the window. When Wyatt found he was
unable to help from the driver's side, he returned to the
passenger's door. Wyatt then entered the van on the
passenger side and punched Gonzalez in the head in an
attempt to subdue him. Ellis then observed Gonzalez reach
toward the van's gear shift. He believed Gonzalez was trying
to shift the van into drive, so he struck Gonzalez with his
flashlight in an attempt to stop him. Gonzalez did not
comply.

**2.**

Now, we arrive at the undisputed events that placed
Officer Wyatt in danger and precipitated the shooting. These
events occurred in as little as five and at most in ten seconds,
and they address what the majority concedes is "the most
important" *Graham* factor: the immediacy of the *threat*.
*Mattos*, 661 F.3d at 441.

Wyatt tried to control Gonzalez's right arm, however,
Gonzalez reached forward toward the gear shift and slapped
it into drive and "stomped down" on the gas pedal. Fearing
he would be pulled forward with the van, Ellis pulled himself
out of the driver's door window, hitting Gonzalez on the head
as he withdrew. Ellis stepped back as the van moved
forward. He ran to his patrol car to chase after the van. Still
in the van, Wyatt yelled at Gonzalez to stop. Gonzalez did
not comply. Wyatt reached with his left hand and attempted
to turn off the ignition or shift the transmission into neutral or
park. Gonzalez hit his hand away. This sequence occurred
two to three times. With Gonzalez driving and Wyatt in the

van on the passenger side, the van went through the cross-street intersection of Bond Street and Willow Street. Wyatt yelled at Gonzalez to stop, but Gonzalez did not comply. Wyatt unholstered his weapon and shot Gonzalez in the head, killing him. Wyatt grabbed the steering wheel with both hands. In an attempt to stop the van, he steered it into a parked truck. The collision with the truck dislodged Wyatt's gun from his right hand. The van continued to roll after the collision, stopping finally at the intersection of Bond Street and Elm Street, a block from Willow Street. After the van stopped, Ellis, who had followed in his patrol car, observed a bag lying on the street beneath the van's open passenger door. A knife was also found later when detectives processed the scene.

## C.

### The Legal Consequences
### of Gonzalez's Behavior

Now, let's translate the undisputed facts into their legal consequences, a step *Garner* and *Graham* require to determine whether the officers were "confronted with a serious crime."

When Officer Ellis and Officer Wyatt walked up to Gonzalez's van, they entered a zone of personal danger.[6] In that zone, the Supreme Court has approved of requiring Gonzalez to turn off his vehicle, of removing him from the

---

[6] *See Terry*, 392 U.S. at 23–24; *Mimms*, 434 U.S. at 110–11; *Long*, 463 U.S. at 1046–47.

van,[7] of patting him down for weapons, and of taking command of the situation.[8]

Gonzalez's uncooperative, suspicious, and menacing behavior when first approached by the uniformed officers gave them reason to believe he had in his possession either a weapon or contraband — or both. Officer Wyatt then *warned* Gonzalez, as contemplated by *Garner*, that if he "reached down there again he would be shot." Gonzalez did not obey this warning, and he did not turn off the car's engine or unlock its doors.

By now, Gonzalez's recalcitrant behavior violated California Penal Code ("CPC") § 148, resisting, delaying, or obstructing a peace officer in the discharge or attempt to discharge his duties. Then, Gonzalez attempted to eat a plastic baggie, giving Officer Ellis and Officer Wyatt probable cause to believe he was in possession of an illegal substance — another crime — and destroying evidence. This set of facts is precisely what the Court had in mind in *Michigan v. Summers*, when it discussed a narcotics suspect's willingness to use violence in an attempt to avoid apprehension. *See* 452 U.S. at 702–03.

As Gonzalez "stomped" on the van's accelerator and attempted to flee, he struck Officer Wyatt's hands numerous times with his own, adding to his offenses — in a matter of seconds — the additional crimes of (1) battery against a peace officer in violation of CPC §§ 242, 243; (2) felonious false imprisonment of Officer Wyatt in violation of CPC §§ 236,

---

[7] *Mimms*, 434 U.S. at 111 & n.6

[8] *Johnson*, 555 U.S. at 330; *Brendlin*, 551 U.S. at 258.

237; (3) felonious kidnaping of Officer Wyatt in violation of CPC § 207; and (4) flight from a pursuing officer (Officer Ellis) in violation of California Vehicle Code § 2800.1. It is beyond argument that had Officer Wyatt not stopped Gonzalez, Gonzalez would have accelerated his van and continued to attempt to escape with Officer Wyatt trapped inside the van, and with Officer Ellis — and probably others — in hot pursuit.

## D.

Now we come to an aspect of this case the majority does not discuss: Gonzalez's choice to flee in his vehicle from the scene — with Officer Ellis in pursuit. Gonzalez's dangerous choice weighs heavily on whether or not Officer Wyatt faced an immediate indication of impending danger while trapped in Gonzalez's van.

In *Scott v. Harris* the Supreme Court published its take on the hazards of a motorist engaged in public-endangering flight. As Justice Scalia expressed the question in that case, "Can an officer take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders?" 550 U.S. at 374. The Court's answer? Yes. Why? Because car chases place "police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. By comparison, continued the Court, unlike the flight of the young, slight, unarmed burglary suspect who was on foot in *Garner*, Harris's "flight itself (by means of a speeding automobile) . . . posed the threat of 'serious physical harm . . . to others.'" *Id.* at 382 n.9. "It was [Harris], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that

ultimately produced the choice between two evils that [Deputy] Scott confronted." *Id.* at 384.

The Court deemed it "appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability." *Id.*; *see also Mattos*, 661 F.3d at 445 (a defiant suspect "bears some responsibility for the escalation" of an incident resulting in the use of force). The culpable person here was Gonzalez.

*Sykes v. United States*, _____ U.S. _____, 131 S. Ct. 2267 (2011), is even more on point than *Scott v. Harris* regarding the potential for injury caused by a motorist fleeing to avoid apprehension. In *Sykes*, the motorist fled after an officer had ordered him to stop. The question for the Court was whether Sykes's flight was "violent."

> When a perpetrator defies a law enforcement command by fleeing in a car, the determination to elude capture makes a lack of concern for the safety of property and persons of pedestrians and other drivers an inherent part of the offense. *Even if the criminal attempting to elude capture drives without going at full speed or going the wrong way, he creates the possibility that police will, in a legitimate and lawful manner, exceed or almost match his speed or use force to bring him within their custody. A perpetrator's indifference to these collateral consequences has violent — even lethal — potential for others*. A criminal who takes flight and creates a risk of this dimension takes action similar in degree of danger to that involved in

arson, which also entails intentional release of a destructive force dangerous to others. This similarity is a beginning point in establishing that vehicle flight presents a serious potential risk of physical injury to another.

Another consideration is a comparison to the crime of burglary. Burglary is dangerous because it can end in confrontation leading to violence. The same is true of vehicle flight, but to an even greater degree. *The attempt to elude capture is a direct challenge to an officer's authority. It is a provocative and dangerous act that dares, and in a typical case requires, the officer to give chase.* The felon's conduct gives the officer reason to believe that the defendant has something more serious than a traffic violation to hide. In Sykes' case, officers pursued a man with two prior violent felony convictions and marijuana in his possession. In other cases officers may discover more about the violent potential of the fleeing suspect by running a check on the license plate or by recognizing the fugitive as a convicted felon.

Because an accepted way to restrain a driver who poses dangers to others is through seizure, officers pursuing fleeing drivers may deem themselves duty bound to escalate their response to ensure the felon is apprehended. *Scott v. Harris* rejected the possibility that police could eliminate the danger from a vehicle flight by giving up the chase because

the perpetrator "might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow." And once the pursued vehicle is stopped, it is sometimes necessary for officers to approach with guns drawn to effect arrest. Confrontation with police is the expected result of vehicle flight. It places property and persons at serious risk of injury.

Risk of violence is inherent to vehicle flight. Between the confrontations that initiate and terminate the incident, the intervening pursuit creates high risks of crashes. It presents more certain risk as a categorical matter than burglary. It is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others. Flight from a law enforcement officer invites, even demands, pursuit. *As that pursuit continues, the risk of an accident accumulates. And having chosen to flee, and thereby commit a crime, the perpetrator has all the more reason to seek to avoid capture.*

Unlike burglaries, vehicle flights from an officer by definitional necessity occur when police are present, are flights in defiance of their instructions, and are effected with a vehicle that can be used in a way to cause

serious potential risk of physical injury to
another.

*Id.* at 2273–74 (emphasis added) (citations omitted).

## E.

In summary starting with the three *Graham* factors, I
conclude that the facts in the record compel one conclusion,
and only one conclusion a jury could reach: Officer Wyatt's
use of deadly force to stop Gonzalez's behavior was
objectively reasonable.  First, Officer Wyatt was "confronted
with a serious crime," indeed multiple crimes.  Second,
Gonzalez posed "an immediate threat" to Officer Wyatt's
safety and to the safety of others.  Third, Gonzalez was
"actively resisting arrest" and attempting to evade arrest by
flight.  I cannot envision any scenario wherein this case might
survive a motion for judgment as a matter of law pursuant to
Rule 50(a)(B).

## VI

## A.

The "factual dispute" my colleagues in the majority see
as "material" is the speed Gonzalez was driving when Officer
Wyatt shot him.  Because the only summary judgment
disputes that matter are those that are "material," I disagree.[9]
The actual or the estimated speed of the van at the moment of
the shooting is not material.  Neither is the "average speed"

---

[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
586–87 (1986) (only issues of "*material* fact" can defeat a motion for
summary judgment) (emphasis added).

of an accelerating vehicle in flight from the police. What is material is that Gonzalez suddenly accelerated his van away from the traffic stop with Officer Wyatt trapped inside and traveled for a block before it crashed. Who cares how fast the van was going? Gonzalez's representatives admit that Gonzalez unexpectedly tried to flee without warning, and that when Officer Wyatt tried to stop him, Gonzalez physically fought him off. I do not comprehend how this constellation of facts fails to demonstrate a real threat of impending harm to Officer Wyatt, as well as to members of the public.

The majority's discussion of speed cannot be squared with Justice Kennedy's declaration in *Sykes* that "[e]ven if the criminal attempting to elude capture drives without going at full speed . . . , he creates the possibility that police will . . . use force to bring him within their custody. A perpetrator's indifference to these collateral consequences has violent — *even lethal* — potential for others." 131 S. Ct. at 2273 (emphasis added). Gonzalez certainly posed a direct threat to Officer Wyatt when he chose to flee.

In an unconvincing attempt to make this dispute over speed "material," the majority unwittingly engages in exactly the type of rear-view-mirror microanalysis the Supreme Court has told us to eschew. The majority has converted Officer Wyatt's precarious ten-second episode in Gonzalez's van into an ex post facto exercise in calculus, the world of the derivative and the integral.[10] They impose a new duty on

---

[10] Professor Michael Starbird of the University of Texas at Austin demonstrates how calculus can be used to determine the velocity of a moving vehicle. POST might want to include this exercise in its officer training programs.

police officers: when you are in a zone of immediate danger involving a moving vehicle in which you are being kidnaped, you must calculate the speed of the vehicle as you try to turn off the ignition and to disengage the gearshift.  Then, you must refrain from using deadly force until the vehicle speeds up to a point where a crash will surely threaten your life (or have the presence of mind to try something else).  At that point, the use of deadly force too late will not only disable the driver, but probably you, too.  And let us not forget, the majority thinks it would be nice if you would give one more warning before you shoot.

Here, I agree with Judge O'Scannlain's discussion of this issue, as the author of the three-judge panel majority opinion.

> Gonzalez's representatives . . . argue that Wyatt's testimony that the van traveled approximately fifty feet either contradicts his

---

If we think of function $v(t)$ as measuring the velocity of a moving car at each time $t$, then the integral is a number that is equal to the distance traveled, because the integral is obtained by dividing the time from $a$ to $b$ into small increments and approximating the distance traveled by assuming that the car went at a steady speed during each of those small increments of time.  By taking increasingly smaller increments of time, approximations converge to a single answer, the integral.  This sounds complicated, but the naturality of it is the topic of Lecture 3.  The integral is also equal to the area under the graph of $v(t)$ and above the $t$-axis.  The integral is related to the derivative (as an inverse procedure) via the Fundamental Theorem of Calculus.

Michael Starbird, *Change and Motion: Calculus Made Clear* 10 (The Great Courses 2d ed. 2006).

testimony that the events took "less than ten" and possibly "less than five seconds" or indicates that the van was traveling so slowly that it could not have been a threat.

First, even assuming that the van was traveling relatively slowly, the threat of acceleration—and the threat to Wyatt's life—remained. . . . Thus, the van's *speed is not a material fact*, even if it were actually disputed. The dissent does not address this point.

Second, the rough estimates of time taken and distance traveled stated in Wyatt's deposition were just that—rough estimates. Wyatt's story is "internally consistent" if we do not ascribe unfounded precision to his estimates. It would be surprising if an officer could recount precise quantitative details about an incident which took mere seconds over a year later. A minor inconsistency in officer testimony does not alone create a dispute of material fact.

*Gonzalez v. City of Anaheim*, 715 F.3d 766, 771–72 (9th Cir. 2013) (footnote omitted).

Judge O'Scannlain's reference to the "threat of acceleration" came from our decision in *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010). In that case, an officer shot and killed the driver of a slow-moving minivan that the officer thought might run over his partner. The driver's representatives contended that the minivan posed no threat

because it was moving too slowly to endanger the officers. We flatly rejected that argument, saying that the vehicle "could have gained traction at any time, resulting in a sudden acceleration in speed." *Id.* at 552.

Why did we acknowledge in *Wilkinson* that vehicles driven by fleeing criminals can suddenly accelerate only to brush aside this indisputable fact here? Moreover, we rebuked the plaintiff in *Wilkinson* for giving us a "sanitized version of the incident" because it omitted the "urgency of the situation." *Id.* at 551–52. When Officer Wyatt shot Gonzalez, his situation was every bit as urgent as Officer Torres's, if not more so. We held in *Wilkinson*, involving facts quite similar to this case, that Officer Torres "did not violate a constitutional right." *Id.* at 551. The majority's claim of "no evidence of anyone else in danger" is technically true only because Officer Wyatt ended the chase before news helicopters had the opportunity to film Gonzalez as he raced around Southern California freeways. Now, stopping a chase before it gets completely out of control inures to Officer Wyatt's detriment.

### B.

The majority also errs in suggesting that the speed-distance-time information would support a jury conclusion that "Gonzalez had not stomped down on the accelerator." What they overlook is that this issue is before us as a matter of summary judgment, and that Gonzalez's representatives do *not* dispute the fact that Gonzalez stomped down on the gas pedal. I quote again from the record. "Gonzalez reached forward toward the gear shift and 'slapped' the gear shift into a driving gear, and 'stomps down' on the gas pedal." Gonzalez's representatives objected only to what Officer Ellis

was doing at this time, saying nothing about Gonzalez or Officer Wyatt. It is this simple. If Gonzalez's representatives accept for the purposes of summary judgment that Gonzalez stomped on the gas pedal, it is not for us to claim that he did not. Moreover, both officers said that when Gonzalez "floored" it, the van's tires squealed on the roadway. That sound is exactly what occurs when a vehicle is violently accelerated.

## C.

Back to the question of the van's speed, Officer Wyatt wasn't looking out the van's window as Gonzalez drove away, calculating elapsed time, distance covered, and integrals. Officer Wyatt was yelling at Gonzalez to stop. He was looking at the ignition and the gearshift as he tried physically to stop the van and prevent Gonzalez's attempt to escape. Moreover, it was dark outside. I defy anyone under these circumstances to have the presence of mind and the ability to calculate the speed of a moving vehicle. Without exterior visual cues, it is next to impossible. The majority makes the mistake of failing to place themselves in Gonzalez's van and in Officer Wyatt's shoes, engaging instead in a classroom exercise in determining speed from time and distance. The majority's approach violates the rule that we are (1) to make allowance for the fact that officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances, and (2) to be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.

**D.**

Next, we get to the majority's should-have-shot-the-gun-out-of-his-hand suggestion, which comes from Hollywood westerns, certainly not from the streets of our cities. The Seventh Circuit has a clear-eyed take on the assertion that alternative methods short of deadly force must be used to resolve a dangerous situation. In *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994), Plakas's administrator argued that the defendant officer, instead of shooting Plakas, should have used a non-lethal cannister of CS Gas he carried on his belt, or used a canine unit on the scene to take Plakas down, or tried to isolate him while keeping a safe distance. The argument was that failing to use these available methods rendered unreasonable the use of deadly force. In rejecting this contention, the court said,

> There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first.

*Id.* at 1148 (footnote omitted).

> It is true we consider the whole of the event as it appears to the officer involved, but we recognize that the decision to shoot can only be made after the briefest reflection, so brief

that "reflection" is the wrong word.  As
Plakas moved toward Drinski, was he
supposed to think of an attack dog, of Perras's
CS gas, of how fast he could run backwards?
Our answer is, and has been no, because there
is too little time for the officer to do so and
too much opportunity to second-guess that
officer.

*Id.* at 1149.

The majority says Officer Wyatt could have used a baton,
pepper spray, or maybe a Taser.  The record does not contain
a shred of evidence that such methods would have been
effective — to the contrary.  To speculate that such methods
would have safely ended the chase disregards the officers'
escalating reasonable use of nonlethal force against Gonzalez,
hitting him with their fists, trying to put him in a carotid hold,
and striking him with a flashlight, but nothing worked.[11]
Officer Wyatt warned him that he would be shot if he
continued to display dangerous behavior, but even a threat of
that magnitude did not register.  Officer Wyatt ordered him
to stop the van.  Verbal commands and warnings had no
effect.  Under these circumstances, giving him another
warning was neither feasible nor required, nor would it have
caused Gonzalez to stop.  He was determined, albeit
foolishly, to try to escape.  As we said in *Forrett v.
Richardson*, 112 F.3d 416, 421 (9th Cir. 1997), *superseded on
other grounds as stated in Chroma Lighting v. GTE Prods.
Corp.*, 127 F.3d 1136 (9th Cir. 1997), another excessive force

---

[11] I do agree with the majority that this use of force was reasonable and
that the district court's grant of summary judgment in favor of the officers
on these theories and Gonzalez's due process claim was appropriate.

shooting case, "[t]he only objectively reasonable conclusion to be drawn from this evidence is that if [the officers] had not shot him, he would have continued taking whatever measures were necessary to avoid capture."

The Supreme Court said in *Michigan v. Long* that a vulnerable officer — which Officer Wyatt surely was — "must make a 'quick decision as to how to protect himself and others from possible danger . . . .' In *such circumstances, we have not required that officers adopt alternate means to ensure their safety . . . .*" 463 U.S. at 1052 (emphasis added) (citation omitted). We said the same thing in *Wilkinson*: "A reasonable use of deadly force encompasses a range of conduct, and *the availability of a less-intrusive alternative will not render conduct unreasonable*." 610 F.3d at 551.

### E.

Finally, the majority observes that the officers had no information that the driver had previously committed any crime, had any prior contact with law enforcement, had any involvement with weapons, or that the van might be stolen. All of this what-the-event-wasn't information is irrelevant because it is irreconcilable with what the Supreme Court has said about the inherent hazards of ordinary traffic stops and car chases. Read the Court's discussion in *Terry v. Ohio, Pennsylvania v. Mimms, Michigan v. Long, Maryland v. Wilson, Michigan v. Summers, Arizona v. Johnson, Scott v. Harris*, and *Sykes v. United States*. Moreover, when Gonzalez began to resist, to flee, and to strike Officer Wyatt, everything the majority finds missing from their sterile scenario became irrelevant.

## VII

Given the undisputed facts in the record, the officers' actions that led to the unfortunate death of Adolph Gonzalez fall squarely and objectively within the Supreme Court's description of a regrettable situation justifying the use of deadly force. My colleagues on the other side, "far removed from the scene and with the opportunity to dissect the elements of the situation," have failed to heed the Court's warning not to second guess from the peace, safety, and comfort of our chambers a split-second decision in the field, a decision Officer Wyatt made under extreme pressure in a perilous situation. *Ryburn*, 132 S. Ct. at 991. Their opinion, rendered "with the benefit of hindsight and calm deliberation," will become the subject of confusing law enforcement training and can only impede and endanger all law enforcement officers in the discharge of their sworn duties with respect to patrolling our streets and keeping the peace in our neighborhoods. *Id.* at 992

The Sixth Circuit has taken to heart the Supreme Court's cautionary instructions about our task in these cases. After quoting *Garner*'s admonitory language, the Sixth Circuit said,

> This passage carries great weight in this case, since all parties agree that the events in question happened very quickly. *Thus, under Graham, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and*

> *complex world that policemen face every day.*
> *What constitutes "reasonable" action may*
> *seem quite different to someone facing a*
> *possible assailant than to someone analyzing*
> *the question at leisure.*

*Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

The unmistakable message that comes from this case will cause officers inappropriately to hesitate in the face of danger in a confrontation with a combative suspect who refuses to obey lawful commands and warnings. The result in turn will endanger both the police and the public at large as officers worry that they may (this case) or may not (*Wilkinson*) end up in court for years.

I end where I began, with the Supreme Court's message to both the police as well as to lawbreakers like Gonzalez.

> [W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness. Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent

>bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

*Scott*, 550 U.S. at 385–86 (emphasis in original).

>Where the officer has probable cause to believe that the suspect poses a *threat* of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.

*Garner*, 471 U.S. at 11 (emphasis added).

---

Chief Judge KOZINSKI, with whom Circuit Judges TROTT, TALLMAN and BEA join, dissenting:

It's undisputed that, at the time he fired the fatal shot, Officer Wyatt was trapped inside a moving vehicle driven by a man who had resisted the verbal commands, physical restraints, lethal threats and bodily force of two uniformed officers. How fast the van was moving and how far it had traveled are beside the point. What matters is that Officer Wyatt was prisoner in a vehicle controlled by someone who had already committed several dangerous felonies. No sane officer in Wyatt's situation would have acted any differently, and no reasonable jury will hold him liable. The only thing this remand will accomplish is to give plaintiffs a bludgeon with which to extort a hefty settlement. The Supreme Court should foil the plan with a swift summary reversal.